```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA


     UNITED STATES OF AMERICA

                  vs.                     Criminal No. 24-257

     MOHAMAD HAMAD




     Transcript of Proceedings held on, April 29, 2025, in the
     United States District Court, 700 Grant Street, Pittsburgh,
     PA  15219, before Honorable Patricia L. Dodge, United
     States Magistrate Judge.




APPEARANCES:

     For the Government:    U.S. Attorney's Office
                            Nicole A. Vasquez Schmitt, Esquire


     For the Defendant:     Office of the Federal Public Defender
                            Andrew Lipson, Esquire
                            Yemi Olaiya, Esquire


     Court Reporter:        Melissa Moore, RDR, RMR, CRR
                            700 Grant Street, Suite 6260
                            Pittsburgh, PA  15219




     Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription
```

EXHIBIT A                                                    1

I N D E X

WITNESSES                                                           PAGE

BENJAMIN ORRISON

    Direct Examination by Ms. Vasquez Schmitt              4
    Cross-Examination by Mr. Lipson:                      8
    Redirect Examination by Ms. Vasquez Schmitt          18
    Recross Examination by Mr. Lipson                    20

GREGORY BATTAGLIA

    Direct Examination by Ms. Vasquez Schmitt            21
    Cross Examination by Ms. Olaiya                       63
    Redirect Examination by Ms. Vasquez Schmitt          81
    Recross Examination by Ms. Olaiya                    84

1          P R O C E E D I N G S

2      (In open court.  Defendant present with counsel.)

3          THE COURT:  Good afternoon, everyone.  Please be

4   seated.  All right.  We are here this afternoon for a

5   detention hearing in the matter of the United States versus

6   Mohamad Hamad at docket 24-257.  Would counsel enter their

7   appearances, please.

8          MS. VASQUEZ SCHMITT:  Good afternoon, Your Honor.

9   Nicole Vasquez Schmitt on behalf of the United States.

10         THE COURT:  Good afternoon.

11         MS. OLAIYA:  Good afternoon, Your Honor, may it

12  please the court, Yemi Olaiya and Andrew Lipson on behalf of

13  Mr. Mohamad Hamad.

14         THE COURT:  Good morning to all of you.  All right,

15  in connection with this matter, it comes before the court on

16  the government's request to detain Mr. Hamad pending the trial

17  in this matter.

18         And considering the government's request, I'm guided

19  by several steps -- several different principles.

20         First, at all times, Mr. Hamad is entitled to the

21  presumption of innocence.  Nothing that takes place in this

22  hearing and nothing that I set forth in my findings is

23  intended or should be construed to affect that presumption.

24         Rather, the purpose of this proceeding is to

25  determine whether or not withstanding that presumption,

EXHIBIT A                    3

4

1    Mr. Hamad should be detained pending trial in this matter.

2          I also want to advise counsel, as I'm sure they're

3    already aware, that I am guided by the Bail Reform Act, which

4    requires me to consider whether there are some conditions or

5    combination of conditions that will reasonably assure the

6    safety of others in the community and/or reasonably assure the

7    appearance of Mr. Hamad as required.

8          With that, Ms. Vasquez Schmitt, are you ready to

9    proceed?

10          MS. VASQUEZ SCHMITT:  Yes, Your Honor.  Thank you.

11    The government calls United States Probation Officer Ben

12    Orrison.

13          THE COURT:  Please step forward to be sworn.

14       (Administration of the oath.)

15          THE DEPUTY CLERK:  Please take the witness stand.

16    Please state and spell your name for the court reporter.

17          THE WITNESS:  Benjamin Orrison, B-E-N-J-A-M-I-N,

18    Orrison, O-R-R-I-S-O-N.

19          BENJAMIN ORRISON, a witness herein, having been first

20    duly sworn, was examined and testified as follows:

21                    DIRECT EXAMINATION

22    BY MS. VASQUEZ SCHMITT:

23    Q.  Good afternoon.

24    A.  Good afternoon.

25    Q.  How are you employed?

EXHIBIT A                    4

5

1   A.  By the U.S. Probation and Pretrial Services Office.

2   Q.  How long have you been a United States Probation Officer?

3   A.  Since 2013.

4   Q.  Are you assigned at the current time to supervise

5   defendants who are on pretrial release?

6   A.  I am.

7   Q.  Were you assigned to supervise the defendant, Mohamad

8   Hamad, after his arrest on October 30th, 2024?

9   A.  I was.

10  Q.  Did the defendant give you his United States passport?

11  A.  He did.

12  Q.  Did the defendant give you a Lebanese passport?

13  A.  He did not.

14  Q.  The defendant has been on home detention, correct?

15  A.  Correct.

16  Q.  Does that allow the defendant to request windows to leave

17  the home to attend work, school, or religious services?

18  A.  That's correct.

19  Q.  While the defendant was on home detention, did he make any

20  efforts to get a job?

21  A.  He cited barriers with his health and transportation, so

22  there are not a lot of, I believe, attempts to locate

23  employment.

24  Q.  Was he ever employed during the span of his home

25  detention?

EXHIBIT A                    5

1   A.  He was not.

2   Q.  Did the defendant enroll in any educational classes while

3   he was on home detention?

4   A.  He did not.

5   Q.  To your knowledge, what religion does the defendant

6   practice?

7   A.  Islam.

8   Q.  Did the defendant seek permission, while on home

9   detention, to attend a mosque?

10  A.  He did.

11  Q.  Did the defendant, while on home detention, also seek

12  permission to attend a Christian church?

13  A.  He did.

14  Q.  Was that Valley View Presbyterian at 601 North Aiken

15  Avenue, Pittsburgh, Pennsylvania, 15206?

16  A.  Yes.

17  Q.  Is that church in his neighborhood?

18  A.  It is not.

19  Q.  Is it fairly far away, across town?

20  A.  Yes.

21  Q.  How often did the defendant attend that church?

22  A.  Approximately ten times.

23  Q.  And when did that attendance begin?

24  A.  Sometime beginning around February.

25  Q.  So ten times between February of 2025 and when he was most

1    recently arrested?

2    A.  That's correct.

3    Q.  What was the window that you gave the defendant to attend

4    the church on Sundays?

5    A.  I don't remember the specific time.  I believe it was

6    around, like, 9:00 a.m. to 2:00 p.m. or give or take an hour.

7    Q.  So around five hours?

8    A.  Yeah, four or five hours sounds accurate.

9    Q.  Was one of the conditions of the defendant's bond not to

10   contact any witnesses in this case?

11   A.  There was.

12   Q.  Did the defendant tell you that the church, the Valley

13   View Presbyterian Church, was associated with Micaiah Collins

14   in any way?

15   A.  He did not.

16   Q.  Did the defendant tell you that Ms. Collins was referenced

17   in his complaint and could be a potential witness in the case?

18   A.  He did not.

19   Q.  Based on your conversation just a few moments ago with

20   Probation Officer Simpson, do you know, was there -- the bond

21   report says that the only residents at the home are the

22   defendant and his parents.  Is that accurate?

23   A.  No.  I think we've learned that the younger sister is also

24   a full-time occupant of the home.

25   Q.  Is she 15 years old?

8

1    A.  That sounds accurate.

2    Q.  And is her name A?  █████████████

3    A.  Again, sounds accurate.

4        MS. VASQUEZ SCHMITT:  Thank you, no further

5    questions.

6        MR. LIPSON:  Your Honor, just for the record, since

7    the government just referred to a minor, if that could be

8    referred to as an initial as opposed to her proper name?

9        THE COURT:  Yes, let's do that.  And we'll do that in

10   the transcript.

11       MS. VASQUEZ SCHMITT:  Thank you, Your Honor.  No

12   further questions.

13       THE COURT:  Any cross-examination?

14       MR. LIPSON:  Yes, Your Honor.

15                    CROSS-EXAMINATION

16   BY MR. LIPSON:

17   Q.  Good afternoon, Officer Orrison.

18   A.  Good afternoon.

19   Q.  You testified that you've been supervising Mr. Hamad since

20   his release -- since approximately October 30th of 2024,

21   correct?

22   A.  That's correct.

23   Q.  And during the course of your supervision of Mr. Hamad,

24   have you noted any sort of negative behavior or issues that

25   are related to his conditions of release?

EXHIBIT A                8

1   A.  No.

2   Q.  Has he been in regular contact with you as a pretrial

3   supervisee?

4   A.  Yes, he has.

5   Q.  Have you had any issues contacting him during the course

6   of his supervision?

7   A.  Not at all.

8   Q.  Now it's my understanding that he's been placed on home

9   detention with electronic monitoring; is that right?

10  A.  That's correct.

11  Q.  So is that GPS monitoring?

12  A.  Yeah, the type of technology we used on Mr. Hamad was GPS.

13  Q.  And that means that your office is able to see his

14  whereabouts, whether he's at the home or out in the community?

15  A.  Correct.

16  Q.  And at any point did that malfunction?

17  A.  No.

18  Q.  To your knowledge, at any point was Mr. -- was Mr. Hamad

19  in a place where he was not supposed to be, or in a place not

20  authorized by you and your office?

21  A.  No.

22  Q.  Did you make any home visits of Mr. Hamad while he was

23  under your supervision?

24  A.  I did.

25  Q.  Approximately how often?

EXHIBIT A                          9

1  A.  Initially, probably every couple weeks.  Eventually, about

2  every 30 days or so.

3  Q.  Why did you step down the frequency of your home visits

4  with Mr. Hamad?

5  A.  Just getting a better understanding on the case, the

6  circumstances, and yeah, basically, you know, any barriers

7  that he may have or, you know, I had better time to assess

8  what was going on with the case.

9  Q.  Would it be fair to say that by visiting his home less

10  frequently, it's because it was determined that you didn't

11  need to go there as frequently as you went at the outset of

12  the supervision?

13  A.  I would say that's appropriate.

14  Q.  And is that generally based on a positive assessment of

15  how he was adjusting under supervision of you and your office?

16  A.  Yes.

17  Q.  When you did go to his home, who did you encounter?

18  A.  Every time Mr. Hamad, sometimes his mother.  I think I

19  encountered the minor sister on at least one occasion, and the

20  father on at least one occasion.

21  Q.  And do you see Mr. Hamad's mother and father here in court

22  today?

23  A.  I do.

24  Q.  And are they seated in the second row behind counsel for

25  the government?

1    A.  They are.

2    Q.  Were your interactions with the family pleasant, cordial,

3    and helpful?

4    A.  Yes.

5    Q.  Any -- did you observe, or did you or anybody with whom

6    you work observe, any sort of attempt to obstruct your

7    investigation or supervision with Mr. Hamad?

8    A.  No.

9    Q.  Any attempt to prevent you from looking in parts of the

10   home or reviewing any electronic devices which were subject to

11   the very strict conditions of the release?

12   A.  No.

13   Q.  Did Mr. Hamad, during any of these home visits, engage in

14   any of these behaviors, obstructing your proper supervision of

15   him or the devices in the home?

16   A.  He did not.

17   Q.  You testified on direct that there were times when

18   Mr. Hamad asked for windows to leave his home to attend

19   certain religious services?

20   A.  That's correct.

21   Q.  For example, you testified on direct that he asked for a

22   window of times to go to his local mosque?

23   A.  Correct.

24   Q.  And at other times, he asked, and it sounds like

25   approximately ten times, he asked for window to go to a, I

1    think it's Valley View Presbyterian Church, correct?

2    A.  Correct.

3    Q.  When -- and you granted those windows, correct?

4    A.  Correct.

5    Q.  You granted those windows, in part, because he was

6    following the conditions of his supervision to that point, and

7    there was no reason to doubt that that's where he was going,

8    correct?

9    A.  He had GPS on, and he has the ability to practice whatever

10   religion he wants while on home detention.  So not trying to

11   impede that.

12   Q.  Okay.  When he obtained these windows for either the

13   mosque or the church that he attended, was there anything in

14   the GPS data that suggested that he didn't go right to those

15   locations?

16   A.  Not that I recall, yes.

17   Q.  Anything to suggest that, following that window, to

18   suggest that he went to some other location before returning

19   immediately home?

20   A.  No.

21   Q.  Did you or any case agent, or to your knowledge any member

22   of the case agent on this case, go to either the mosque or

23   the -- or the Valley View Presbyterian Church during those

24   windows that you were there?

25   A.  I have no idea if any of the agents of the investigation

```
 1    did, but the probation office did not go during the time in
 2    question.
 3    Q.  Okay.  So it's fair to say, other than attending the
 4    worship services at those locations, you have no reason to
 5    know one way or the other whether he was doing anything else
 6    while he was there?
 7    A.  Correct.
 8              MR. LIPSON:  One moment, Your Honor.
 9              THE COURT:  Take your time, Mr. Lipson.
10    BY MR. LIPSON:
11    Q.  Before I go to his conditions of release, you had
12    mentioned that Mr. Hamad had cited certain health and
13    transportation barriers to working?
14    A.  Yes.
15    Q.  Can you please explain those for the court?
16    A.  He had been cited, I believe, by Moon Township or the
17    Pennsylvania State Police, I don't recall which one, on some
18    occasion, driving excessively fast above the speed limit and,
19    as a result, was informed that his license would be suspended.
20    So he had to relinquish his license at some point and thus
21    suffered some transportation barriers.
22    Q.  And he conveyed that all to you, correct?
23    A.  Yes.
24    Q.  And he explained that his license was suspended, right?
25    A.  Yep.
```

EXHIBIT A                              13

1   Q.  And to your knowledge, did he ever drive while his license

2   was suspended under supervision?

3   A.  I don't know, but I don't believe so.

4   Q.  You also mentioned some health barriers.  Do you know what

5   those were?

6   A.  Yeah, he had reported some health issues that required

7   some medical follow-up, some blood tests and whatnot.  But I

8   don't have details as to what those medical issues were.

9   Q.  Now, in connection with attempts at employment, you and I

10  had communications with an individual who was interested in

11  potentially employing Mr. Hamad?

12  A.  Yeah, very, very early on we did.  But I believe once the

13  transportation issue popped up, he felt that that wouldn't be

14  appropriate for him at that time.

15  Q.  All right.

16          MR. LIPSON:  Permission to approach, Your Honor?

17          THE COURT:  You may.

18  BY MR. LIPSON:

19  Q.  I'm going to show you what's been marked for

20  identification purposes as Defense Exhibit I and H.  Starting

21  with Defense Exhibit H, this is a document filed on the docket

22  in this case at Case Number 24-cr-257 at Document 17.  Do you

23  recognize that document?

24  A.  I do.

25  Q.  In connection with supervising Mr. Hamad, I imagine you're

1    familiar with the order setting conditions of release?

2    A.  I am.

3    Q.  As probably the essential document that governs the

4    conditions that you have to ensure that he abides by, correct?

5    A.  Absolutely.

6            MR. LIPSON:  Your Honor, at this time, although I

7    could ask the court to take judicial notice of Defense Exhibit

8    H, I'd move for its admission into the record.

9            THE COURT:  Any objection?

10            MS. VASQUEZ SCHMITT:  No, Your Honor.

11            THE COURT:  It's admitted.

12    BY MR. LIPSON:

13    Q.  Turning your attention to page 2 of 6 of Defense Exhibit

14    H, there is a condition 7(g).  Do you see that?

15    A.  I do.

16    Q.  And 7(g) states the defendant must avoid all contact,

17    directly or indirectly, with any person who is or may be a

18    victim or witness in the investigation or prosecution,

19    including, and it says including, again, any Jewish-owned and

20    affiliated business entities, educational institutions,

21    nonprofit organizations, or any other persons, businesses,

22    organizations, or educational institutions identified by the

23    United States Probation and Pretrial Services Office.  Is that

24    what condition 7(g) stated in Document 17?

25    A.  It did.

EXHIBIT A                    15

1    Q.  And you're aware that then there was some -- there was

2    litigation about that condition thereafter that the parties

3    addressed at a preliminary hearing, I believe, that was

4    approximately November 7th, 2024, correct?

5    A.  Correct.

6    Q.  And turning your attention to Defense Exhibit I, what is

7    that document?

8    A.  That appears to be, I guess, maybe the docket entry from a

9    hearing on the preliminary examination.

10   Q.  And that's at Case Number 24-cr-257, which is this case,

11   correct?

12   A.  24-1794.

13   Q.  I would direct your attention to the top of the page?

14   A.  Oh, okay, gotcha.

15   Q.  It says 24-cr-257, correct?

16   A.  Yes.

17   Q.  And you were referring to the case caption 24-mj-1794,

18   which was the case number for this case prior to the

19   indictment filed, the first indictment filed by the government

20   in this case, correct?

21   A.  That is correct.

22   Q.  When it was just a criminal complaint?

23   A.  Correct.

24   Q.  Do you recognize this document?

25   A.  I don't believe I've ever seen this document, but I was

1    present for the hearing that day.

2         MR. LIPSON:  Your Honor, at this time I'd move what's

3    been marked as Exhibits I and H.

4         THE COURT:  What document is that?

5         MR. LIPSON:  My apologies, Your Honor, this is at

6    Document 30 on the docket.

7         MS. VASQUEZ SCHMITT:  No objection, Your Honor.

8         THE COURT:  All right, then Exhibit I is admitted.

9    BY MR. LIPSON:

10   Q.  Turning your attention to the second page of Defense

11   Exhibit I, it says as to condition 7(g), this condition is

12   stricken, correct?

13   A.  Correct.

14   Q.  You said you've been a probation officer in this district

15   since 2013, correct?

16   A.  Correct.

17   Q.  In the roughly -- after having served in that capacity for

18   12 years, is there anything during your supervision of

19   Mr. Hamad that you've observed that you would like to share

20   with the court that causes concern for his following the rules

21   of his conditions of release?

22   A.  Can you maybe rephrase the question, what you're --

23   Q.  Do you have any cause of concern, based on what you've

24   personally observed as a supervising agent, that Mr. Hamad is

25   following your rules?

EXHIBIT A                    17

1  A.  That he followed the rules or would follow the rules?

2  Q.  That he has followed the rules.

3  A.  Yeah, no concern that he followed the rules.

4  Q.  And he's been under supervision of your office for roughly

5  six months now?

6  A.  Yes.

7          MR. LIPSON:  No further questions, Your Honor.

8          THE COURT:  Thank you, Mr. Lipson.  Anything further?

9          MS. VASQUEZ SCHMITT:  Just very briefly, Your Honor.

10                    REDIRECT EXAMINATION

11  BY MS. VASQUEZ SCHMITT:

12  Q.  When you were asked on cross exam about the defendant's

13  transportation problems, can someone seeking employment, can

14  they take a bus to get to work?

15  A.  They can.

16  Q.  And do you often try to work with people you're

17  supervising to overcome transportation issues like the

18  defendant had?

19  A.  We do.

20  Q.  Regarding the condition, is it a standard condition of

21  being on pretrial release not to have contact with witnesses

22  in the case?

23  A.  Yes.

24  Q.  And not -- notwithstanding specific language of 7(g) about

25  Jewish, et cetera, but is it a standard condition that

1  everyone has to follow, that you not be in contact with
2  witnesses in a case?
3  A.  Yes, typically.  I'm not sure I've noticed that box
4  unchecked.
5  Q.  And so is it possible in this case, maybe those special
6  conditions with respect to the Jewish-owned, et cetera, were
7  taken off, but that based on your work, never seen that box
8  unchecked, the defendant was not supposed to be in contact
9  with witnesses?
10        MR. LIPSON:  Objection, Your Honor.  I think that
11  calls for speculation what Judge Taylor's intent was when she
12  said 7(g) was stricken.  I don't think he has the basics to
13  opine on that.
14        MS. VASQUEZ SCHMITT:  Based on his experience, Your
15  Honor.
16        THE COURT:  Well, based on his experience, I know
17  he's already testified about not ever seeing that box
18  unchecked.  If he participated in the hearing and heard
19  something that would inform us, he could bring that up.
20        MS. VASQUEZ SCHMITT:  Okay, thank you, Your Honor, I
21  can move on.
22  BY MS. VASQUEZ SCHMITT:
23  Q.  And is that because -- do you know why, why is it that you
24  have a condition to not contact witnesses?
25  A.  Typically, I believe it's just so somebody can't

EXHIBIT A                    19

1    potentially intimidate another witness or person in the case,

2    or somehow influence some, you know, affect of the case.

3    Q.  Right.  It's to potentially influence witnesses' --

4    A.  Yeah.

5    Q.  -- future testimony?  And when you have defendants on

6    pretrial release, would you approve -- on home detention,

7    would you approve a window for them to go and meet with

8    potential witnesses in a case?

9    A.  Not before checking everything out.  Whether it's calling

10   the government to get additional information or, you know,

11   kind of stopping in with the office to determine where that

12   line is drawn.

13          MS. VASQUEZ SCHMITT:  Thank you.  No further

14   questions.

15          THE COURT:  Thank you.

16          MR. LIPSON:  One brief question on follow.

17          THE COURT:  Sure.

18                    RECROSS EXAMINATION

19   BY MR. LIPSON:

20   Q.  Officers Orrison, are you aware -- you visited the Hamad

21   family home, correct?

22   A.  Yes.

23   Q.  And that's where Mr. Hamad resided during the course of

24   his supervision?

25   A.  Correct.

EXHIBIT A                    20

1    Q.  Were you aware of how long a walk it is to the closest bus

2    stop to Pittsburgh?

3    A.  I'm not -- yeah, no.

4            MR. LIPSON:  No further questions, Your Honor.

5            THE COURT:  Officers Orrison, you can step down.

6    Thank you.

7            THE WITNESS:  Thank you.

8            MS. VASQUEZ SCHMITT:  Your Honor, the government

9    calls FBI Special Agent Gregory Battaglia.

10           THE COURT:  All right.  Please step forward to be

11   sworn.

12       (Administration of the oath.)

13           THE DEPUTY CLERK:  Please take the witness stand.

14   Please state and spell your name for the court reporter.

15           THE WITNESS:  My name is Gregory Battaglia,

16   G-R-E-G-O-R-Y, B-A-T-T-A-G-L-I-A.

17           GREGORY BATTAGLIA, a witness herein, having been

18   first duly sworn, was examined and testified as follows:.

19                    <u>DIRECT EXAMINATION</u>

20   BY MS. VASQUEZ SCHMITT:

21   Q.  Can you please tell the court how you are employed?

22   A.  I'm a Special Agent with the Federal Bureau of

23   Investigation, commonly the FBI.

24   Q.  How long have you been in that position?

25   A.  Since April of 2022.

1    Q.   What did you do before you were an FBI Special Agent?

2    A.   Prior to I was employed by the FBI as a staff operations

3    specialist, essentially an analytical position within the FBI.

4    Q.   What type of investigations do you work on as an FBI

5    Special Agent?

6    A.   Well, I'm assigned to the International Terrorism Squad of

7    the Joint Terrorism Task Force within the FBI.

8    Q.   Have you worked on the investigation involving the

9    defendant, Mohamad Hamad?

10   A.   I have.

11   Q.   Is the defendant a United States citizen?

12   A.   He is.

13   Q.   Is the defendant a Lebanese citizen?

14   A.   He is.

15   Q.   In 2023, did the defendant enlist with the United States

16   Air Force Pennsylvania Air National Guard?

17   A.   He did.

18   Q.   In connection with that, did the defendant undergo a

19   background investigation with an agency called the Defense

20   Counterintelligence and Security Agency?

21   A.   He did.

22   Q.   Is that commonly referred to as the DCSA?

23   A.   It is.

24   Q.   The government has so many acronyms, right?

25        What did the defendant tell the DCSA about his past work?

EXHIBIT A                    22

1   A.  So originally he told DCSA, in their first interview, that

2   he did have a Lebanese passport and that he used it for travel

3   abroad.

4   Q.  And then did he -- did he have a later interview and state

5   something else?

6   A.  He did.  Approximately five days later, I believe, he had

7   a second encounter with the DCSA interviewing party where he

8   stated, after speaking with a family member, his father, that

9   he did not have a Lebanese passport.

10  Q.  Was there some instances reporting to the DCSA regarding

11  whether he did or did not have a Lebanese passport?

12  A.  There was.

13  Q.  Does the defendant have family and friends in Lebanon?

14  A.  He does.

15  Q.  Initially, in the paperwork for his background

16  investigation for the U.S. military, did the defendant list

17  any of those numerous foreign contacts?

18  A.  He did not.

19  Q.  Did you review a police report involving Mohamad Hamad

20  from 2022?

21  A.  I did.

22  Q.  And just briefly, what did that police report relate to?

23  A.  It related to the defendant's arrest for terroristic

24  threats and assault.

25  Q.  And, Your Honor -- is that marked as Government's

EXHIBIT A                          23

1   Exhibit 1 in your binder there?

2   A.  It is.

3          MS. VASQUEZ SCHMITT:  Your Honor, I move to admit and

4   publish Government's Exhibit 1.

5          THE COURT:  Any objection?

6          MS. OLAIYA:  None, Your Honor.

7          THE COURT:  All right, Exhibit 1 is admitted.

8   BY MS. VASQUEZ SCHMITT:

9   Q.  All right, we're going to go through this police report.

10  And there are some highlights in the document.  Did I add

11  those highlights during our prep for this hearing?

12  A.  You did.

13  Q.  So I'm going to page 5 of Government's Exhibit 1.  What

14  was the, in the first paragraph there, in the highlights, can

15  you briefly describe to the court who went to Moon Township,

16  and what was the reporting?

17  A.  So, two of the defendant's siblings contacted 911 after it

18  was brought that the defendant had assaulted their mother.

19  Q.  Okay.  And so, is that 13-year-old sibling with the

20  initials A.H. and his 20-year-old brother Ali Hamad?

21  A.  It is.

22  Q.  And one of the allegations is that, I believe you said, he

23  pushed their mother, correct?

24  A.  Correct.

25  Q.  Okay.  And then moving down the report, can you explain

EXHIBIT A                    24

1   what we have highlighted here toward the end of this page?

2   A.  Absolutely.  So the night before, according to the police

3   report, one of the defendant's siblings was listening to loud

4   music or talking on the phone loudly.  This upset the

5   defendant, and the defendant went into the sibling's room with

6   a pellet gun, held it out to his side, and told his sibling

7   that he would shoot her in the face and hurt her if she would

8   not be quiet.

9   Q.  And what did Ali, in the highlighted paragraph, what did

10  the defendant's brother report was the nature about the

11  description of the gun?

12  A.  So the defendant's brother told law enforcement officers

13  that it was a pellet gun, a rifle-style pellet gun that shoots

14  metal pellets at approximately 1,200 fps.

15  Q.  What is 1,200 fps?

16  A.  The rate, feet per second, that a projectile leaves a

17  firearm.

18  Q.  How does -- this is a pellet gun, right?

19  A.  Correct.

20  Q.  So how does 1,200 fps compare to a regular firearm?

21  A.  It is fairly one and the same with a real firearm.

22  Q.  So it shoots a bullet just as fast as a real gun?

23  A.  A pellet, correct.

24  Q.  Sorry, thank you.  Shoots a pellet just as fast as a real

25  gun would shoot a bullet?

1  A.  A bullet, correct.

2  Q.  Thank you.  Did Ali also report other incidents in the

3  past involving his brother?

4  A.  Correct.  So the defendant's brother also told law

5  enforcement that previously the defendant held a knife to the

6  defendant's brother's throat resulting in local law

7  enforcement arresting the defendant.

8  Q.  Did the brother and sister, the sister who was 13 years

9  old at the time, did they tell the police how they were

10  feeling about their brother?

11  A.  So unequivocally, both of them stated without hesitation

12  that they are fearful of the defendant, and the defendant's

13  brother stated that the defendant's behavior was escalating,

14  his words, yelling, you can read it there, yelling derogatory,

15  vulgar, language, threatening everyone in the family.

16  Q.  Did those last highlights, we're on to page 6 of

17  Government's Exhibit 1, and the last highlights that you see

18  there on the screen, what did the officers note about the

19  demeanor of the reporting sibling?

20  A.  Yeah, so the defendant's sibling was visibly upset,

21  shaking, scared.

22  Q.  Did -- does it say there something about the 13-year-old

23  and school?

24  A.  Correct.  The defendant's minor sibling was unable to

25  focus on schoolwork due to being in constant fear.

1   Q.  There was -- was there a supplemental entry here on the

2   report by law enforcement?

3   A.  There was.

4   Q.  And in this supplemental entry, did the law enforcement

5   note anything that Mohamad Hamad allegedly said to his sister

6   when he was threatening her with a pellet gun?

7   A.  The defendant stated he would do it because he's, quote,

8   crazy.

9   Q.  Did the -- did the brother and sister also make any

10  reports to the police about the way that the defendant treated

11  his parents?

12  A.  Correct.  So the defendant's siblings stated that -- that

13  he did -- did assault his mother previous to.

14  Q.  And then right on the first paragraph that I have on that,

15  you see on your page that's highlighted, does it say there

16  they both stated that Mohamad is physically threatening to his

17  parents, that they are inclined not to report such things?

18  A.  Correct.

19  Q.  Was the defendant placed under arrest for this incident?

20  A.  He was.

21  Q.  Did -- was there any -- anything of note about the rifle

22  itself?

23  A.  So responding law enforcement noticed that the standard

24  orange tip on a pellet gun had been painted black as to mask

25  the orange tip.

EXHIBIT A                    27

1  Q.  With the tip painted black, would it appear as a regular

2  assault rifle?

3  A.  Correct.  To a common person it would appear as a

4  traditional rifle.

5  Q.  Have you reviewed a copy of the superseding indictment in

6  this case?

7  A.  I have.

8  Q.  Has that been marked as Government's Exhibit 2 in your

9  binder?

10  A.  It is.

11         MS. VASQUEZ SCHMITT:  Your Honor, just, I don't know

12  that I need to, like as defense counsel said with some of

13  their exhibits, but I would move to admit and publish

14  Government's Exhibit 2.

15         THE COURT:  I assume there's no objection to that.

16         MS. OLAIYA:  None, Your Honor.

17         THE COURT:  All right.  Thank you.  It's admitted.

18         MS. VASQUEZ SCHMITT:  Thank you, Your Honor.

19  BY MS. VASQUEZ SCHMITT:

20  Q.  I'd like to just highlight a few things from the

21  superseding indictment.  I'm going to start with paragraph 18,

22  and I'm going to ask you to do some reading.

23  A.  Okay.

24  Q.  Okay.  Can you read paragraph 18 for the record, please?

25  A.  While Hamad was attending Air Force training, he shared

EXHIBIT A                    28

1    violent pro-Hamas videos.  For example, on or about
2    October 31, 2023, Hamad sent an associate in Pittsburgh,
3    quote -- or paren, Person 3, a series of violent -- five
4    violent militant propaganda videos.  One of the videos is
5    dated October 7, 2023, the date of the October 7 Hamas attack,
6    and shows a man being shot repeatedly at point-blank range.
7    Another video shows militants holding the flag for Hamas's
8    military wing, the al-Qassam Brigades, while standing on top
9    of the dead body.  In the conversation, Hamad wrote, quote,
10   Yeah, for real, but they, paren, Israel, made the mistake of
11   thinking we wouldn't do anything when they kept killing us.
12   Us Muslims never surrender or back down.
13   Q.  Briefly for the court, what is Hamas?
14   A.  Hamas is a designated foreign terrorist organization.
15   Q.  And what was the October 7th -- what is the October 7th
16   Hamas attack that's referenced in this paragraph?
17   A.  That was the date in which Hamas launched a series of
18   violent attacks into Israel, essentially killing hundreds of
19   citizens within Israel to include U.S. citizens, taken others
20   as hostage, including U.S. citizens.
21   Q.  And two of the videos described in paragraph 18, are they
22   marked as Government's Exhibit 3 and 4?
23   A.  They are.
24        MS. VASQUEZ SCHMITT:  Your Honor, I would move to
25   admit Government's Exhibit 3 and 4.

1              THE COURT:  Any objection?

2              MS. OLAIYA:  I would object, Your Honor, at this

3     time.

4              THE COURT:  On what grounds?

5              MS. OLAIYA:  Mostly on the basis, Your Honor, that

6     it's not relevant and salacious to the court.

7              MS. VASQUEZ SCHMITT:  Your Honor, the evidence is

8     salacious because the defendant chose to send it, and it

9     directly goes to his propensity to violence, to his history

10    and characteristics, to the videos that he was sharing at the

11    time that he was attending basic training in this case, and

12    bears directly on the defendant's danger to the community,

13    Your Honor.

14             THE COURT:  All right.  I'm going to admit them over

15    objection.

16             MS. VASQUEZ SCHMITT:  I'm going to play the first

17    video, Government's Exhibit 3.

18        (The video exhibit was played in open court.)

19    BY MS. VASQUEZ SCHMITT:

20    Q.  I'm going to pause that for a second.  What is the date up

21    in the left corner of this video?

22    A.  It is October 7th, 2023.

23    Q.  Is that the date of the attacks you were just testifying

24    about?

25    A.  It was.

EXHIBIT A                    30

1          (The video exhibit was played in open court.)

2     BY MS. VASQUEZ SCHMITT:

3     Q.  Did Government's Exhibit 3 appear to be a video of a man

4     being shot at point-blank range?

5     A.  It did.

6     Q.  Was one of the militants in the video wearing a green

7     headband?

8     A.  They were.

9     Q.  Does Hamas -- are they known for wearing green headbands?

10    A.  That is one of the characteristics or emblems.

11    Q.  I'm going to play now Government's Exhibit 4.

12         (The video exhibit was played in open court.)

13    Q.  Special Agent Battaglia, did you see what appeared to be

14    several murdered individuals in that video?

15    A.  I did.

16    Q.  Did some of them appear to be civilians?

17    A.  There were some that were not wearing traditional military

18    attire, correct.

19    Q.  Did it appear at one point that others were being taken

20    hostage and loaded onto a truck?

21    A.  Correct.

22    Q.  Is the screenshot from that video marked as Government's

23    Exhibit 5 there in your binder?

24    A.  It is.

25              MS. VASQUEZ SCHMITT:  Your Honor, I move to admit and

EXHIBIT A                    31

1     publish Government's Exhibit 5.

2              MS. OLAIYA:  Same objection, Your Honor.  Mr. Hamad

3     is not responsible for these videos; he hasn't created them.

4     Just the propensity for violence as he was not directly

5     involved in any of the actions portrayed here.

6              THE COURT:  I'm going to admit it over your

7     objection.

8              MS. VASQUEZ SCHMITT:  Thank you, Your Honor.

9     Q.  Could you please describe what we're looking at in

10    Government's Exhibit 5, which is the screenshot from the video

11    of Government's Exhibit 4?

12    A.  So it appears to be two armed men displaying a flag which

13    is consistent with the al-Qassam Brigade, which is Hamas's

14    military wing, standing on top of what appears to be a

15    deceased man.

16    Q.  Thank you.  Paragraph 19, can you just read, please, the

17    first two sentences of paragraph 19 of the superseding

18    indictment?

19    A.  Okay.  On or about November 11, 2023, Hamad sent Person 1

20    two videos.  The first video had the text that read, quote, A

21    new generation is coming, end quote, and depicted young

22    children, even babies, being shown videos of Abu Obaida, the

23    spokesperson for Hamas al-Qassam Brigades.

24    Q.  The al-Qassam Brigades, is that what you just testified

25    that that flag in the last picture is associated with?

EXHIBIT A                    32

1   A.  Correct.

2   Q.  That's the military wing, I think you said, of Hamas?

3   A.  Correct.

4   Q.  So have you watched that video?

5   A.  I have.

6   Q.  And did it show young kids, like as we say there, even

7   babies, being shown Hamas propaganda?

8   A.  It did.

9   Q.  Paragraph 24, can you please read that for the court?

10  A.  On or about December 28, 2023, Hamad sent Person 1 a video

11  with the caption, in Arabic, quote, Hezbollah announces the

12  targeting of a newly installed point for the Israeli Army near

13  Shomera military base.  The video depicts several men being

14  targeted and then blown up in an explosion.  Hamad stated,

15  quote, Lebanon just smoked they ass, end quote.

16  Q.  What is Hezbollah?

17  A.  It is Iran-backed Shia militia group which predominantly

18  operates within Lebanon.  They are a designated foreign

19  terrorist organization.

20  Q.  The video that we -- the videos that we were previously

21  discussing and this video, was Hamad -- was the defendant at

22  Air Force training, including basic training, while he was

23  sharing these pro-FTO videos?

24  A.  He was.

25          MS. VASQUEZ SCHMITT:  Your Honor -- or sorry, excuse

1    me.

2    Q.  Special Agent Battaglia, is the video referenced in

3    paragraph 24 marked as Government's Exhibit 6?

4    A.  It is.

5            MS. VASQUEZ SCHMITT:  Your Honor, I would move for

6    the admission and to publish Government's Exhibit 6.

7            THE COURT:  I'm assuming you have the same objection?

8            MS. OLAIYA:  Correct, Your Honor.

9            THE COURT:  I'm going to allow it, not to show the

10   propensity for violence, specifically, but just that this was

11   shared by Mr. Hamad.

12           MS. VASQUEZ SCHMITT:  Thank you, Your Honor.

13           I'm going to start running again, Your Honor.  I

14   wasn't on that screen.

15           THE COURT:  Very well.

16      (The video exhibit was played in open court.)

17   BY MS. VASQUEZ SCHMITT:

18   Q.  Again in Government's Exhibit 6, did we see people

19   apparently being murdered in this video?

20   A.  We did.

21   Q.  And as stated in the superseding indictment, the

22   defendant's comment was, Lebanon just whipped they ass?

23   A.  Correct.

24   Q.  Paragraph 32 of the superseding indictment, can you read

25   that, please?

1    A.  On or about March 13, 2024, Hamad threatened an unknown

2    individual on Instagram, stating, quote, I can't wait until

3    the day Muslims kill you.  I would be so happy, at this point

4    I'm done debating.  You are better off to the world not

5    breathing, end quote.

6    Q.  Was the FBI able to determine who the defendant had

7    threatened?

8    A.  We were not.

9    Q.  Paragraph 33, and then there's a picture after it of a

10   sweatshirt.  Do you see that?

11   A.  I do.

12   Q.  Can you explain what we're looking at on the sweatshirt?

13   A.  So that is a photo, yeah, a photo depicting Abu Obaida who

14   previously was mentioned was the spokesperson of Hamas's

15   military wing, an inverted red triangle, which has been used

16   by Hamas and others to depict a target, if you will, and then

17   the English words underneath, Respect existence or expect

18   resistance.

19   Q.  And did the defendant post about this and say, look what

20   came in the mail today, with a heart eyes emoji?

21   A.  Correct.

22   Q.  Was this sweatshirt later found in the defendant's

23   residence?

24   A.  It was.

25   Q.  The red inverted triangle, I believe you testified, does

EXHIBIT A                           35

1    Hamas use that to designate targets for attack?

2    A.   Correct.

3    Q.   Based on what you've learned in your work as a JCTF FBI

4    agent, did Hamas spray paint that sometimes on buildings?

5    A.   They did.

6    Q.   Does the superseding indictment allege that the defendant

7    spray painted a red triangle on a Chabad in this case?

8    A.   It does.

9    Q.   Paragraph 35, can you read just that first sentence,

10   please?

11   A.   On or about June 1, 2024, Hamad messaged Lubit via

12   Telegram, quote, My ultimate goal in life is Shaheed,

13   everything else doesn't matter nearly as much, I don't see

14   myself living long, my heart yearns for being with my brothers

15   overseas.

16   Q.   What is Shaheed?

17   A.   Shaheed is a common term for an individual who dies via

18   martyrdom, dies throughout enacting their faith.

19   Q.   Did the FBI see multiple messages from the defendant in

20   which he stated his desire to die a martyr?

21   A.   We did.

22   Q.   Paragraph 37, and then there's a picture above it.  Do you

23   see that?

24   A.   I do.

25   Q.   Did the defendant send this picture to co-defendant

1    Micaiah Collins and refer to himself as a terrorist?

2    A.  He did.

3    Q.  The messages in paragraph 44, do you see paragraph 44?

4    A.  I do.

5    Q.  Are those messages marked as Government's Exhibit 7?

6    A.  They are.

7         MS. VASQUEZ SCHMITT:  Your Honor, I move to admit and

8    publish Government's Exhibit 7.

9         MS. OLAIYA:  No objection, Your Honor.

10         THE COURT:  All right.  Exhibit 7 is admitted.

11   BY MS. VASQUEZ SCHMITT:

12   Q.  Okay.  Can you describe what we're seeing on Government's

13   Exhibit 7?

14   A.  So you are seeing Instagram messages sent between the

15   defendant and an individual named Fernn.

16   Q.  And was the date of the messages June 27th, 2024?

17   A.  They were.

18   Q.  So there's some messages from Fernn.  What was she

19   responding to?

20   A.  They were responding to the image of the defendant with a

21   rifle on his Instagram story.

22   Q.  And can you read the messages from Fernn, please?

23   A.  Bro, hell yeah, you're so fucking cut, cool.

24   Q.  And then, sorry, I went a page too far.  And then can you

25   please read the three messages in response from the defendant?

1    A.   So outgoing messages back, aww, thank you, I'm so happy,

2    with hearts.  Knew you would love it, with a heart emoji.  And

3    then terrorist mode engaged, with a devil emoji.

4    Q.   And then how did Fernn respond?

5    A.   Responded, hell yeah, threat to U.S. government confirmed,

6    with a flex emoji.  And then incoming message further, again,

7    the inverted triangle, Palestinian flag, and sent the photo

8    which appears to be a cartoon of a male and a female with

9    assault-style rifles.

10   Q.   Thank you.  Paragraph 54 and 55, let's go through this.

11   Can you just read paragraph 54, please?

12   A.   On or about July 4, 2024, Hamad messaged Collins saying,

13   quote, I want to die fighting.  I want it now so bad.  I don't

14   want to be here anymore, quote.  Collins responded saying,

15   quote, If I can see tonight, we can do something in our little

16   space we've created you know, end quote.  Hamad responded that

17   he was, quote, feeling a lot of anger.

18   Q.   So as of July of 2024, when the defendant was messaging

19   co-defendant Collins that he wanted to die fighting, did she

20   suggest, let's just do something inside of Pittsburgh?

21   A.   Correct.

22   Q.   Can you read paragraph 56, please?

23   A.   On or about July 5, 2024, Hamad messages an associate in

24   East Liverpool, Ohio, Person 6, stating quote, To be clear, I

25   want to go over there in Palestine and help.  Fight, fight.

EXHIBIT A                    38

1    Person 6 asked Hamad how would that conflict with your

2    military obligations.  I just don't want to see you in trouble

3    or under investigation.  You know what I mean?  Hamad

4    responded, quote, I understand.  I'll delete my chats.

5    Q.  So was the defendant's friend trying to dissuade him from

6    going overseas to fight?

7    A.  He was.

8             MS. OLAIYA:  May I object, Your Honor, at this time.

9    Calls for speculation.

10            THE COURT:  Sustained.

11   BY MS. VASQUEZ SCHMITT:

12   Q.  The picture after paragraph 57, do you see that on the

13   screen?

14   A.  I do.

15   Q.  Did the defendant post this on Instagram?

16   A.  He did.

17   Q.  What text did he add to the picture?

18   A.  I'm all right, y'all, say a prayer with me.

19            MS. OLAIYA:  Objection, Your Honor, at this time.

20   This is a lack of foundation to determine whether or not this

21   post already had this imposed or whether or not it was

22   somebody else that the government is alleging.

23   BY MS. VASQUEZ SCHMITT:

24   Q.  When you review, or in your training and experience, do

25   you often review posts such as these from various social media

1    platforms?

2    A.  Correct.

3    Q.  And including Instagram?

4    A.  Correct.

5    Q.  And when you were reviewing -- when the FBI was reviewing

6    this post, based on all of the surrounding circumstances, did

7    the FBI conclude that the defendant had added this text?

8    A.  I -- it is consistent with an individual, the defendant,

9    adding the text.

10   Q.  And did he post this either way?

11   A.  He did.

12   Q.  Okay.  You can read the text, please.

13   A.  All right, y'all, say a prayer with me.  Inshallah one day

14   each bullet in this mag kisses the forehead of the Zionist

15   oppressor, amen.

16   Q.  What is a Zionist?

17   A.  Commonly an individual who believes in the creation and

18   protection of a Jewish state, which is modern-day Israel.

19   Q.  The pictures after paragraph 60, do you see that?

20   A.  I do.

21   Q.  What are those pictures?

22   A.  Those are screen captures of a video exchange between the

23   defendant and Ms. Collins.

24   Q.  Is this a picture that the FBI believes that was the

25   defendant and Ms. Collins detonated on July 6, 2024?

1  A.  The device, correct.

2  Q.  Did the FBI uncover messages that made the FBI concerned

3  that the defendant and Collins were testing the device for

4  future use to hurt people?

5  A.  Correct.

6  Q.  Let's look at some other messaging.  Going back to

7  paragraph -- oops.  Pardon me.  Going back to paragraph 46.

8  Can you read that, please?

9  A.  Collins expressed excitement about lighting the device,

10  stating, quote, 'cuz when we do the thing, with the thing, oh,

11  yeah, it's over, and quote, bro's ankles gone.  Collins also

12  suggested inviting defendant Lubit to join them in lighting

13  the device.  Hamad responded, I kinda just wanna test it with

14  you, as I've never done something that big, lol, and then

15  another day very soon we can do bro's ankles with Lubit.

16  While at the same time seeing if what I made is gonna be

17  viable and work.

18  Q.  Do you -- the defendant's use of the word viable, what

19  does that suggest to you, based on your training and

20  experience?

21  A.  That they --

22          MS. OLAIYA:  Objection, Your Honor, speculation.

23          THE COURT:  Can you establish a foundation?

24          MS. VASQUEZ SCHMITT:  Sure, Your Honor.

25  BY MS. VASQUEZ SCHMITT:

EXHIBIT A                    41

1    Q.  In your work with the JCTF, do you encounter cases

2    involving explosives?

3    A.  We do.

4    Q.  And have you reviewed messages such as these involving

5    explosives?

6    A.  We have.

7    Q.  And do you have an opinion based on your work in the JCTF

8    and the FBI just in general about the use of the word viable?

9    A.  One would use the word viable to attest or confirm that

10   something, a device, accomplishes what it was meant to do, in

11   order for a future use.

12   Q.  Paragraph 49, let's read the messages here between Collins

13   and the defendant.  And I can -- I'll read Ms. Collins'

14   messages.

15       You think with that new crazy shells and four to five cans

16   we can really take bro's ankles, concrete gonna blow?

17   A.  Yeah.

18   Q.  We gonna test the big boys with like two and three and

19   see?

20   A.  We are gonna have to test it first and see how it holds

21   up, maybe so.

22   Q.  Gotta see what she hitten for, we gonna fuck shit up.

23       Are these some of the messages that the FBI uncovered that

24   made the FBI concerned about these two defendants using an

25   explosive device?

1    A.  Absolutely.

2    Q.  Did Ms. Collins, on or about July 2nd, 2024, as detailed

3    in paragraph 52, did she message the defendant, I can't wait,

4    I want to learn how to make 'em and can't wait to set 'em off

5    too.  I been thinking about what the fuck we gonna use 'em for

6    like all day every day?

7    A.  Yes.

8    Q.  The picture after paragraph 62 is where I'm going next.

9    Did the defendant, as alleged in the superseding indictment,

10    call himself a Hamas operative when he sent this picture to a

11    friend?

12    A.  He did.

13    Q.  The pictures on page 19, do you see several pictures on

14    page 19?

15    A.  I do.

16    Q.  What are those pictures?

17    A.  Those are devices manufactured and subsequently detonated

18    by the defendant.

19    Q.  Are two of the devices pipe bombs?

20    A.  They are.

21    Q.  Did the FBI learn that the defendant had made these three

22    devices, two of them which were pipe bombs, drove them from

23    Pittsburgh to State College and detonated them?

24    A.  We did.

25    Q.  Is a video of the device that's pictured after paragraph

1   65, is a video of that device marked as Government's

2   Exhibit 8?

3   A.  It is.

4        MS. VASQUEZ SCHMITT:  Your Honor, I move to admit

5   Government's Exhibit 8.

6            THE COURT:  Any objection?

7        MS. OLAIYA:  No objection, Your Honor.

8            THE COURT:  Exhibit 8 is admitted.

9        MS. VASQUEZ SCHMITT:  I'm going to play that now.

10      (The video exhibit is played in open court.)

11  BY MS. VASQUEZ SCHMITT:

12  Q.  Did you hear someone in the video say the device would

13  produce metal shrapnel?

14  A.  I did.

15  Q.  Who said that?

16  A.  The defendant.

17  Q.  Why would someone manufacturing a device need to add metal

18  shrapnel.

19            MS. OLAIYA:  Objection, Your Honor, speculation.

20            MS. VASQUEZ SCHMITT:  Your Honor, I've already

21  established that he has experience as a Joint Terrorism Task

22  Force Agent with cases.

23            THE COURT:  The question is general.  In other words,

24  why would someone do that as opposed to why the defendant may

25  have done that.

1          MS. VASQUEZ SCHMITT:  That's a better question, Your

2     Honor.  Yes.

3          THE COURT:  All right.  You can answer that question.

4          THE WITNESS:  One might do that in order to cause

5     additional damage to tear soft tissue or soft other protected

6     barriers.

7     BY MS. VASQUEZ SCHMITT:

8     Q.  Soft tissue of a person?

9     A.  Correct.

10    Q.  Based on your discussions with others at the FBI, is

11    adding metal shrapnel indicative of the intent to weaponize a

12    device?

13    A.  Correct.

14    Q.  Paragraph -- this is a picture after paragraph 70.  Do you

15    see that?

16    A.  I do.

17    Q.  Did the defendant wear a Hamas-style headband when driving

18    by Chabad before he spray painted it as alleged in the

19    superseding indictment?

20    A.  As alleged, yes.

21    Q.  I think we discussed this, so I won't spend too much time.

22    The picture after paragraph 75, do you see that?

23    A.  I do.

24    Q.  Is this the graffiti the defendant and Lubit are accused

25    of spray painting?

1    A.   It is.

2    Q.   And do you see the red triangle?

3    A.   I do.

4    Q.   So is there a potential threat of violence embedded in the

5    message in this graffiti?

6    A.   There is.

7    Q.   In addition to the graffiti and the explosives, was the

8    defendant charged with lying to a federal agency during his

9    background investigation for the military?

10   A.   He was.

11   Q.   Did -- is it alleged that he lied about being loyal to the

12   United States?

13   A.   It is.

14   Q.   And I won't make you read the whole paragraph, but, we'll

15   go to paragraph 96.  Does paragraph 96 contain a summary of

16   what we allege the defendant's words and actions are that show

17   he was not loyal to the United States?

18   A.   It does.

19   Q.   Actually, can you just start reading where it says "Hamad

20   told others" in the second line?

21   A.   Hamad told others that Lebanon and Palestine were, quote,

22   on top, end quote, and number 1 for him, and that he only

23   joined the U.S. military to learn combat skills to protect

24   Lebanon and Palestine; stated, quote, fuck off Israel and all

25   her friends; stated, quote, let America lick my ass; shared

EXHIBIT A                    46

1    pro-Hamas, and pro-Hezbollah content and propaganda;

2    threatened Zionists; wore Hamas clothing and referred to

3    himself as a Hamas operative and a terrorist; stated his

4    desire to go overseas and fight and die for Palestine;

5    manufactured, possessed, transported, and detonated

6    destructive devices; and defaced Jewish religious real

7    property with pro-Palestine and anti-Zionist graffiti.

8    Q.  Thank you.  All right, let's talk about some items not in

9    the superseding indictment.  Did the defendant work at a

10    military base?

11    A.  He did.

12    Q.  Where?

13    A.  It is the 171st Air Refueling Wing.

14    Q.  What do they do there?

15    A.  They provide refueling and air refueling services for the

16    Department of Defense, NATO, VIP aircraft.

17    Q.  When you say VIP aircraft, if Air Force One needs to be

18    refuelled near Pittsburgh, is that where they would go?

19    A.  Correct.

20    Q.  Did the FBI have concerns about the defendant targeting

21    the military base with a bomb or otherwise?

22    A.  We did.

23    Q.  Are some messages relating to that concern marked as

24    Government's Exhibit 9 in your binder?

25    A.  They are.

1    Q.   What is in Government's Exhibit 9 -- or what is it from?

2    A.   So it is messages between the defendant and Ms. Lubit.

3                MS. VASQUEZ SCHMITT:   Your Honor, I move for

4    admission of Government's Exhibit 9.

5                MS. OLAIYA:   No objection, Your Honor.

6                THE COURT:   Exhibit 9 is admitted.

7    BY MS. VASQUEZ SCHMITT:

8    Q.   Okay.  So what are the green -- who is speaking in the

9    green bubble?

10   A.   So the defendant is in green; Ms. Lubit is in blue.

11   Q.   So can you please read the messages?

12   A.   It's starting May 28th, 2024, the defendant stated, So, I

13   got the official dates of the exercise.

14       To which Ms. Lubit responded, Don't talk about this over

15   text.  I was selfish and reckless yesterday.

16       The defendant responded, Okay.

17   Q.   The defendant referred to the dates of the exercise.  Do

18   you know anything about an exercise at his military base

19   around this time?

20   A.   We do.  So speaking with his supervisor and others at the

21   171st Air Refueling Wing, this was kind of their exercise of

22   the year, right.  The biggest exercise of the year where they

23   work on combat military readiness, kind of coup de grace.

24   Q.   And was that exercise close in time to May 28th?

25   A.   It was.

EXHIBIT A                    48

1    Q.  Was the defendant allowed to attend that exercise?

2    A.  He was not.

3    Q.  Why?

4    A.  At that point, he had not completed his security

5    clearance.

6    Q.  Did these messages cause concern at the FBI that the

7    defendant may have been planning something at the base?

8    A.  Yes.

9    Q.  Was the defendant's home searched twice by the FBI?

10   A.  It was.

11   Q.  Was it August 6th and October 30th?

12   A.  It was.

13   Q.  What was recovered related to explosives?

14   A.  Related to explosives there were hobby fuses.

15   Q.  What wasn't recovered related to explosives?

16   A.  Basically any other precursor chemical, pipe, et cetera.

17   Q.  As alleged in the superseding indictment, did the

18   defendant buy shells?

19   A.  He did.

20   Q.  Did -- is it alleged he bought precursor to make flash

21   powder?

22   A.  It is.

23   Q.  And was any of that found by the FBI?

24   A.  It was not.

25   Q.  Do you know, the two chemicals referenced in the

1  superseding indictment, how much did he buy?

2  A.  So according to our records, he purchased two pounds of

3  black powder, I believe, and two pounds of potassium chloride.

4  Q.  And could -- so four pounds total?

5  A.  Four pounds total.

6  Q.  Could that be used to make a large number of explosives?

7  A.  It could.

8  Q.  Could it be used to make a lot more than the four devices

9  referenced in the superseding indictment?

10  A.  Greater than four, of course.

11  Q.  Does the FBI have a concern that the remainder of the

12  explosive materials have not been located?

13  A.  We do.

14  Q.  Did you read a report about the defendant's arrest on

15  April 23rd, 2025, in connection with the superseding

16  indictment?

17  A.  I did.

18  Q.  And do you actually have that with you there?

19  A.  I do.

20  Q.  I'm not marking it as an exhibit.  But did -- based on

21  your review of that report, did the defendant immediately

22  comply with agents to come downstairs?

23  A.  He did not.

24  Q.  Did the defendant say anything to the arresting agents?

25  A.  A bunch of expletives, basically, fuck you, I'm not coming

1    down, to that extent.

2    Q.  Did he say I'm allergic to gay FBI agents?

3    A.  He did.

4    Q.  When he was thanked for his cooperation, did he say fuck

5    you again?

6    A.  He did.

7    Q.  Are you familiar with the Valley View Presbyterian Church?

8    A.  Generally, yes.

9    Q.  Is that at 601 North Aiken Avenue in Pittsburgh?

10   A.  It is.

11   Q.  Who is the pastor of that church?

12   A.  It is defendant Micaiah Collins' father.

13   Q.  Has -- has Micaiah Collins' father, who is the pastor of

14   that church, has he been associated with the pro-Palestinian

15   movement in Pittsburgh?

16   A.  My understanding is, yes, he has.

17   Q.  Did the FBI find messages between Collins and the

18   defendant referencing meeting at the church before his arrest?

19   A.  Yes.

20   Q.  Was there a period of time the defendant was -- sorry,

21   excuse me -- before the defendant was arrested in October,

22   2024, that he was under FBI surveillance?

23   A.  He was.

24   Q.  Was that in part -- why was that?

25   A.  The standard investigative technique to identify

1    associates, places of business, common pattern of life.

2    Q.  Was the defendant seen at the Valley View Church with

3    co-defendant Micaiah Collins?

4    A.  He was.

5    Q.  Do you -- when was that?

6    A.  That was on October 1st.

7    Q.  Was he seen at the church with anyone else -- I'm sorry,

8    October 1st, 2024?

9    A.  Correct.  October 1st, 2024.

10   Q.  Was he seen at the church with anyone else that night?

11   A.  He was.

12   Q.  Who was it?

13   A.  Miss Talya Lubit.

14   Q.  Who --

15   A.  Oh, I'm sorry.

16   Q.  Do you have that report there?

17   A.  I do.  Oh, my apologies, it was Ms. Collins and

18   Ms. Sharbaji.

19   Q.  Elyanna Sharbaji?

20   A.  Elyanna Sharbaji.

21          THE COURT REPORTER:  Can you spell that?

22          THE WITNESS:  Of course.  It is S-H-A-R-B-A-J-I.

23   Q.  Have you reviewed what has been marked as Government's

24   Exhibit 10 in your binder?

25   A.  I have.

EXHIBIT A                    52

1    Q.   What is that?

2    A.   So this is, I just want to read it quickly.

3    Q.   Of course.

4    A.   I believe it's a note by the defendant.

5    Q.   A note found on his phone?

6    A.   Correct.

7    Q.   What -- was the approximate date of the note sometime in

8    October 2024?

9    A.   It was.

10   Q.   Okay.

11            MS. VASQUEZ SCHMITT:  Your Honor, I move to admit

12   Government's Exhibit 10.

13            MS. OLAIYA:  No objection, Your Honor.

14            THE COURT:  All right.  Exhibit 10 is admitted.

15   BY MS. VASQUEZ SCHMITT:

16   Q.   I know it's long, and you've been doing a lot of reading,

17   but can you please read Government's Exhibit 10?

18   A.   Hey, so I've been thinking.  Some people have been telling

19   me that I should keep coming out to the protests, just keep it

20   tame on my end, and I really want to, but I want opinions of

21   others too.  Elyanna and M both are on board.

22       I can sneak out successfully and be 100 percent sure no

23   one is following me as I can tell if I'm being followed very

24   easily, even from far away.  Elyanna and M both said me being

25   alone and being isolated is what they want.  This would be a

EXHIBIT A                    53

1    form of resistance for me, striking back under their noses.

2        Also, it seems like since Sunday's incident, they have

3    completely stopped in-person surveillance as I've fucked with

4    their operations way too many times now.  But I'm curious as

5    to what others are saying as I also don't want to make others

6    feel uncomfortable.

7        If there's a possibility they are going to take me down

8    with a federal indictment, I'd rather die standing than live

9    kneeling in fear.  If they manage to catch me and lock me up,

10   I'd rather do it when I'm standing up for what I believe in

11   rather than getting locked up when I've already went quiet and

12   already fizzled out.  But please let me know what you and

13   others are thinking.  Thank you.

14   Q.  As you just read, does this note reference Elyanna and M?

15   A.  It does.

16   Q.  And given the date of -- the approximate date of this note

17   and then the date of the surveillance report, is it possible

18   the defendant was talking about the topic, evading

19   surveillance, and defying standing at the church with Elyanna

20   and Micaiah Collins?

21   A.  It's possible.

22            MS. OLAIYA:  Objection Your Honor, speculation.

23            MS. VASQUEZ SCHMITT:  It's possible.

24            THE COURT:  Sustained.

25   BY MS. VASQUEZ SCHMITT:

EXHIBIT A                    54

1    Q.  Is this note close in time to the observations of law

2    enforcement images of the surveillance of the defendant on

3    October 1st, 2024?

4    A.  It was.

5    Q.  Were messages between Micaiah Collins and the defendant in

6    the original complaint in this case, if you know?

7    A.  It was.

8    Q.  So if the defendant read the complaint, would he have

9    known since October 24 that Ms. Collins was a potential

10   witness at that time?

11           MS. OLAIYA:  Objection, Your Honor.

12           THE COURT:  Overruled.  You can answer.

13           THE WITNESS:  Correct.

14   BY MS. VASQUEZ SCHMITT:

15   Q.  Did the FBI approach Micaiah Collins in January 2025 in

16   connection with this case?

17   A.  We did.

18   Q.  Also beginning in January, was the FBI made aware of

19   various public posts regarding the grand jury investigation in

20   this case?

21   A.  We were.

22   Q.  And are those posts and flyers marked as Government's

23   Exhibit 12 and 13?

24   A.  They are.

25           MS. VASQUEZ SCHMITT:  Your Honor, I move for

EXHIBIT A                    55

1    admission of Government's Exhibit 12 and 13.

2              THE COURT:  Any objection?

3              MS. OLAIYA:  I'm sorry, Your Honor.

4              THE COURT:  Take your time.

5              MS. OLAIYA:  Your Honor, I'm not sure that the

6    foundation is laid for Government's Exhibit 12.  So I would

7    ask for clarification for that.

8              MS. VASQUEZ SCHMITT:  Sure.

9    BY MS. VASQUEZ SCHMITT:

10   Q.  Government's Exhibit 12.  Was the FBI made aware by local

11   law enforcement or task force officers about these public

12   posts?

13   A.  We were.

14   Q.  Was the FBI made aware because we're working on this case?

15   A.  Yes.

16             MS. VASQUEZ SCHMITT:  Your Honor, I'm not sure what

17   other foundation is necessary.  I think this document, as we

18   go through it, can explain.

19             THE COURT:  I'm sorry.  Are you still objecting?

20             MR. LIPSON:  My apologies, Your Honor.

21             THE COURT:  No need to apologize.  I think that

22   sufficient foundation has been laid that there was a public

23   post as reflected in Exhibit 12.  Whether it has any relevance

24   here remains to be seen.  But I'm going to admit that

25   document.  What about 13?

EXHIBIT A                    56

1          MS. OLAIYA:  I would have the same objection, Your

2     Honor, as to that.  It doesn't have any bearing or direct

3     relation as to Mr. Hamad.

4          MS. VASQUEZ SCHMITT:  Your Honor, I'll be able to

5     connect the dots.

6          THE COURT:  All right.  Then I'm going to admit them

7     subject to attempts to connect the dots.

8          MS. VASQUEZ SCHMITT:  Okay.  Thank you.  I'm going to

9     publish Government's Exhibit 12.  And I'll be quick with this,

10    Your Honor.

11    BY MS. VASQUEZ SCHMITT:

12    Q.  Are these just an example of a post around the end of

13    January 2025, about a federal grand jury sitting in

14    Pittsburgh?

15    A.  It does.

16    Q.  What is the name of this website that picked up this post?

17    A.  The Anarchist Federation.

18    Q.  And does the post reference a criminal case involving MH

19    and TL?

20    A.  It does.

21    Q.  In addition to posts like this, did the FBI -- was the FBI

22    made aware of public flyers calling for people to support

23    individuals resisting grand jury testimony in this case?

24    A.  We are aware.

25    Q.  And I'll publish Government's Exhibit 13 which has been

EXHIBIT A                              57

1    admitted.  Two pages of this is examples of these flyers?

2    A.  Correct.

3    Q.  Ultimately, was there a public proceeding regarding

4    Ms. Collins' failing to comply with a court order regarding

5    testifying in this case?

6    A.  There was.

7    Q.  Did family and friends of Ms. Collins come to court to

8    support her in that public proceeding?

9    A.  They did.

10   Q.  Were there protests held at our courthouse regarding this

11   case?

12   A.  There was.

13   Q.  Do the defendant and Ms. Collins have friends in common?

14   A.  They do.

15   Q.  Did you hear the testimony from Probation Officer Orrison

16   that since February of this year the defendant has been

17   attending the church of Micaiah Collins' father for several

18   hours on Sunday?

19   A.  I heard his testimony, yes.

20   Q.  So was he going to the church at the same time that this

21   grand jury resistance was going on?

22   A.  He did.

23   Q.  Given the previous surveillance of the defendant and

24   messages you testified about at the church, do you think it's

25   reasonable to conclude he was meeting with Ms. Collins and

1    others he knew when he went to that church while on bond?

2              MS. OLAIYA:  Objection, Your Honor, speculation.

3              THE COURT:  Sustained.

4    BY MS. VASQUEZ SCHMITT:

5    Q.  As of October 2024, we've been discussing, the defendant

6    knew he was under investigation, right?

7    A.  Correct.

8    Q.  Did the defendant -- did we find in his phone some

9    screenshots relating to explosives from October of 2024?

10   A.  We did.

11   Q.  Are those screenshots marked as Government's Exhibit 11?

12   A.  They are.

13             MS. VASQUEZ SCHMITT:  Your Honor, I move to admit

14   Government's Exhibit 11.

15             THE COURT:  Any objection?

16             MS. OLAIYA:  No objection, Your Honor.

17             THE COURT:  Exhibit 11 is admitted.

18             MS. VASQUEZ SCHMITT:  All right.

19   BY MS. VASQUEZ SCHMITT:

20   Q.  So let's go through these.  What is the metadata?  What

21   did the metadata show the date of the screenshots were found

22   on the defendant's phone?

23   A.  October 30, 2024.

24   Q.  Did the FBI determine that these were recipes for

25   explosives?

EXHIBIT A                      59

1  A.  Yes.

2  Q.  Can you just see if I can zoom in here, do you see this

3  poster -- this is not the defendant posting?

4  A.  Correct.

5  Q.  Did you see that this poster says, I recommend you don't

6  mix about 94 percent of ammonium, et cetera, et cetera?

7  A.  Correct.

8  Q.  Is that -- what -- how did you understand that, as an FBI

9  agent?

10  A.  So the individual speaking in the negative, right.  So by

11  I want to do this, it means you wouldn't.

12  Q.  And is there then a recipe there?

13  A.  Of course.

14  Q.  And does the poster say, this recipe is used by lots of

15  bad guys like the IRA and the IRN?

16  A.  Correct.

17  Q.  And then in the next -- on the next page, we just have

18  some more ideas for explosive recipes?

19  A.  Correct.

20  Q.  Does one poster say, you got yourself a powerful explosive

21  that is accessible to everyone?

22  A.  It does.

23  Q.  What was the day that the defendant was arrested

24  originally in this case?

25  A.  It was that date.

1   Q.  So defendant was searching for explosives recipes the day

2   of his arrest?

3   A.  Correct.

4   Q.  So the defendant, prior to the superseding, was arrested

5   on misdemeanor charges, right?

6   A.  Correct.

7   Q.  I know this wasn't your decision, but did the

8   government -- did the government seek detention at that time?

9   A.  They did not.

10   Q.  At the time of his arrest, did the FBI know all of the

11   things that you've testified about here today?

12   A.  No.

13   Q.  For example, did the FBI have trouble accessing the

14   Instagram return?

15   A.  Initially.

16   Q.  Did the FBI -- was the FBI not able to fully review the

17   Instagram return until after his arrest?

18   A.  Correct.

19   Q.  Did the Instagram return include some of the violent

20   pro-Hamas and Hezbollah videos and the threats to Zionists

21   that you've testified about?

22   A.  It did.

23   Q.  The FBI knew about the device with Collins, but did the

24   FBI know the defendant had built pipe bombs at the time of his

25   arrest?

1    A.  Not at the time.

2    Q.  Did the FBI know that the defendant was searching for

3    explosive recipes the day he was arrested?

4    A.  No.

5    Q.  Did the FBI know about the details of the police report

6    involving the defendant's abuse of his family?

7    A.  Not at the time.

8    Q.  Did the FBI know that the defendant explicitly desired to

9    travel to Palestine to fight?

10   A.  Not at the time.

11   Q.  Did the FBI know about the defendant's extensive foreign

12   contacts and possible possession of a Lebanese foreign

13   passport?

14   A.  Not at the time.

15   Q.  Did these new facts learned increase the FBI's concern

16   about how dangerous the defendant is?

17   A.  It did.

18   Q.  Did it also increase the FBI's concern about him

19   potentially fleeing?

20   A.  Of course.

21           MS. VASQUEZ SCHMITT:  No further questions, Your

22   Honor.

23           THE COURT:  Thanks very much.  Cross-examination?

24           MS. OLAIYA:  Yes, Your Honor.  Just out of respect

25   for the court, I'd ask for a minute to look at my notes.

63

1      THE COURT:  That's fine.

2      MS. OLAIYA:  Thank you.

3                        CROSS EXAMINATION

4    BY MS. OLAIYA:

5    Q.  Agent, what is your last name?

6    A.  Battaglia.

7    Q.  Battaglia?

8    A.  Yes, ma'am.

9    Q.  You can mess up my name, so I want to make sure I get

10   yours right.  My name is Ms. Olaiya.  I'm going to ask you a

11   few questions.  If you need me to clarify anything, please let

12   me know.

13   A.  Yes, ma'am.

14   Q.  By starting off, could you give us an overview of what

15   your role is in this case?

16   A.  In this case, I was not the lead investigating case agent,

17   but I supported the investigation as a member of the -- as a

18   member of the overall squad within the FBI Pittsburgh.

19   Q.  And when did you come in on this case?

20   A.  I think initially it would have been, maybe, like October,

21   maybe; I'm trying to go back in history.  It would have been

22   kind of after his initial arrest, basically.  And when some of

23   the comments were being made about the defendant's desire to

24   die a Shaheed, travel overseas, I think that's when I was

25   brought into the mix.

EXHIBIT A                    63

1  Q.  Okay.  So around roughly the time when this case was

2  brought to federal criminal court, that's when you got

3  involved, a little bit after that?

4  A.  Yes, sorry.  I was generally aware of it just from being

5  in the office, but actually providing value, if you will, it

6  would have been after that.

7  Q.  Okay.  And so you're very familiar with the case?

8  A.  I am familiar with the case, yes.

9  Q.  And you read all the material associated with the case?

10  A.  No.  I mean there's currently a lot of individual digital

11  files out there that I personally did not lay eyes on.

12  Q.  Okay.  Well, let's start on with some things that you

13  probably did review?

14  A.  Yeah.

15  Q.  So the information you got was gathered, some of it you

16  talked about on direct, was text messages and Instagram that

17  came from a seized phone from the Hamad residence.  Did you

18  review those?

19  A.  I didn't personally review, but I am aware of the

20  individuals, of the information I testified to.  I'm aware of

21  different reports that were created based on the review.  But

22  I didn't -- I wasn't -- I didn't do the review myself.  If

23  that makes sense.

24  Q.  Okay.  Did you review the superseding indictment?

25  A.  I did.

EXHIBIT A                    64

1    Q.   The original criminal complaint?

2    A.   I did.

3    Q.   That was filed back in the end of October last year?

4    A.   I did.

5    Q.   All right.  So with some of the information that the

6    government has put together in this case, as has already been

7    talked about on direct, some of that came from Instagram,

8    right?

9    A.   Correct.

10   Q.   Okay.  And that physically review -- review Instagram in a

11   case like this, it creates a report as to when it was

12   reviewed, correct?

13   A.   I'm sorry, can you -- say it again?

14   Q.   Sure.  So in cases like this, when you're reviewing

15   someone else's Instagram, it generates a report in relation to

16   that review?

17   A.   You can create a report based off your review, certainly.

18   Q.   Okay.  And your report was generated in this case?

19   A.   I would imagine so, yes.  I mean, as part of the

20   screenshots that ended up in the -- in the indictment.

21   Q.   Okay.

22            MS. OLAIYA:  Permission to approach the witness, Your

23   Honor?

24            THE COURT:  Yes.

25            MS. OLAIYA:  Handing the witness, Your Honor, what's

EXHIBIT A                    65

1    been previously marked Defense Exhibit M.  You can take a

2    minute to review that, please.

3    BY MS. OLAIYA:

4    Q.  Now that references that a report was generated with

5    regards to Instagram on November 6th, 2024, correct?

6    A.  So this report, based off of my knowledge of this process,

7    this appears to be the report generated by Instagram, just

8    based on, like, the commonalities.

9    Q.  Mm-hmm.

10    A.  That's all Instagram generated.

11    Q.  Right.

12    A.  So, yes, Instagram generated this report, or this

13    production, whether it's through a search warrant, what have

14    you.

15    Q.  Okay.  And this was on November 6th?

16    A.  Correct.

17    Q.  Okay.  And it includes the time line of September 23rd up

18    until November 6th, correct?

19    A.  It does.

20    Q.  Okay.  Thank you.

21         MS. OLAIYA:  Permission, Your Honor, to admit Exhibit

22    M.

23         MS. VASQUEZ SCHMITT:  No objection.

24         THE COURT:  All right.  It is admitted.  May I see

25    it, please?  I do have it.  Sorry.

EXHIBIT A                    66

1          MS. OLAIYA:  You're okay.

2   BY MS. OLAIYA:

3   Q.  Now I'm going to switch gears with you a little bit.

4   So moving on to Mohamad's service with the military.  You

5   mentioned him having an interview with a contractor, I guess

6   you will, I believe it was during his background process.  Can

7   you clarify that?

8   A.  That's my understanding as part of a typical background

9   investigation to adjudicate a secret security clearance.

10  Q.  Okay.  So is it common for a contractor to conduct an

11  in-person interview of a line service member like Mohamad was?

12  A.  One who is trying to acquire security clearance, yes.

13  Q.  Okay.  And the line service members like Mohamad, they

14  also require security clearance?  This is something common for

15  folks in his cohort?

16  A.  That would be my understanding.  I mean, I can speak to my

17  experience.  But --

18  Q.  I'm sorry, you were saying that it is common, then?  Or

19  you don't know?

20  A.  I mean, I don't know, right.  I -- that is consistent with

21  my experience, but I can't speak to every DOD service member.

22  Q.  Okay.  Now, you note Mohamad, he was a mechanic, correct?

23  A.  He was.

24  Q.  And mechanics are not taught special combat skills, right?

25  A.  I'm not a DOD member.  I did not receive any DOD training.

1   I can't speak to that.  Maybe if you could ask it another way,

2   but I can't speak to what a DOD employee does or does not

3   receive.

4   Q.  Okay.  So you were able to speak to what the security

5   clearance was, correct?

6   A.  Generally speaking, I can speak to the process of

7   adjudicating a security clearance.

8   Q.  Okay.  But the other surrounding factors you're unaware

9   of?

10  A.  Correct.  Specific to the Department of Defense.

11  Q.  Okay.  Now, in December of 2023, Mohamad was in tech

12  school, correct?  Technical school?

13  A.  I believe that is correct, yes.

14  Q.  He was not in combat or basic training?

15  A.  He was still going through technical school.

16  Q.  All right.  And you said that there was some, essentially,

17  misunderstanding as to whether or not Mr. Hamad had a Lebanese

18  passport?

19  A.  Correct.  Initially he stated he did have one, and he

20  traveled internationally with it.  And then days later in an

21  interview, he stated after speaking with family members he did

22  not have one.

23  Q.  Now during that interview, Mr. Hamad, he made clear his

24  father handled all the traveling documentation, including

25  passports, correct?

69

1    A.  He stated he spoke with his father, and that was the

2    answer they came up with, yes.

3    Q.  So at the time, it was his understanding that he wouldn't

4    have necessarily had all of that information himself, that one

5    of his parents handled that?

6    A.  As a person over 18 --

7    Q.  Just if you could answer my question.

8    A.  Correct.  Yes.

9    Q.  Now, as your role within the FBI, you can determine

10   whether or not a person has a Lebanese passport, correct?

11   A.  So I can determine if a person traveled internationally on

12   a foreign passport, yes.

13   Q.  Have you -- did you do that research in regards to

14   Mr. Hamad?

15   A.  I personally did not, but others may have.

16   Q.  Okay.  So others may have.  Do you know whether or not

17   others in your office have done that in regards to this case?

18   A.  I truthfully do not know the answer.  It is standard to

19   try and review that information.  So I imagine it would have

20   occurred.  But I don't personally know the result of that

21   research.

22        MS. OLAIYA:  Your Honor, I'm just going to ask the

23   witness if he could just look this direction and focus on me.

24   He seems to have a lot of nonverbal communication going on

25   with the AUSA before he answers my questions.

EXHIBIT A                    69

1          MS. VASQUEZ SCHMITT:  Your Honor, I would object to

2    that characterization for the record.  Your Honor, I'm just --

3    I'm not passing signals, especially to Special Agent

4    Battaglia.

5          THE COURT:  I'm not aware of any improper

6    communication.  And certainly, if I was aware of that, I would

7    indicate that.

8          MS. OLAIYA:  Yes, Your Honor.

9    BY MS. OLAIYA:

10   Q.  Okay so there is nothing to show that Mr. Hamad has a

11   Lebanese passport, correct?

12   A.  I have no information -- correct, yes.

13   Q.  So the only passport he has is a United States passport?

14   A.  To my knowledge.

15   Q.  And that has been turned over to the United States

16   Probation Office?

17   A.  It has.

18   Q.  Okay.  All right.  So let's look at some background

19   information.  So the alleged break-in incident that occurred

20   on July 29th, 2024, right?

21   A.  Correct.

22   Q.  So then on August 6th, 2024, there was a search warrant

23   that was executed on Mr. Hamad's residence and his vehicle

24   that was believed to be associated in this case, correct?

25   A.  There was.

1    Q.  And at that time there were no, excuse me, there were --

2    I'm sorry, before I get to that.  There was a second search

3    that also happened at Mr. Hamad's home on October 30th?

4    A.  Correct.

5    Q.  And on October 30th, that is when he was arrested by

6    criminal complaint, correct?

7    A.  Correct.

8    Q.  Okay.  And both times when the home was searched, there

9    were no incendiary devices found, correct?

10   A.  Correct.

11   Q.  No weapons?

12   A.  Correct.

13   Q.  No firearms?

14   A.  Correct.

15   Q.  Nothing that -- notable danger to the FBI?

16   A.  There were no firearms, devices, correct.

17   Q.  Okay.  Now, during the first search of the home, there

18   were a lot of pictures and other things that were taken from

19   the home though, correct?

20   A.  Correct.

21   Q.  Okay.  Now you stated that you reviewed the superseding

22   indictment, correct?

23   A.  I did.

24   Q.  Okay.  So do you have a copy with you?

25   A.  I do.

72

1  Q.  Now, paragraph 34, that is a picture of one of the

2  sweatshirts that was taken from the mosque, correct?

3  A.  Correct.

4  Q.  And that occurred before Mr. Hamad was indicted, correct?

5  A.  Correct.

6  Q.  And then turning to paragraph 37 of the superseding

7  indictment, this picture, this was presumably from when

8  Mr. Hamad was a child, correct?

9  A.  Younger, correct.

10  Q.  Okay.  And this was then from Instagram?

11  A.  I believe so, yes.  Yes, Instagram story.

12  Q.  Okay.  And now, during the search of the home, there was

13  also a phone that was seized that claims to be Mr. Hamad's,

14  correct?

15  A.  There was.

16  Q.  And a lot of that information was included within the

17  criminal complaint that was filed at the end of October,

18  correct?

19  A.  Correct.

20  Q.  And that includes text messages?

21  A.  Correct.

22  Q.  Okay.  Do you have a copy of the original criminal

23  complaint?

24  A.  I don't believe there's one up here, no.

25          MS. OLAIYA:  Permission to approach, Your Honor.

EXHIBIT A                      72

73

1              THE COURT:  You may.

2              THE WITNESS:  Thank you.

3     BY MS. OLAIYA:

4     Q.  You're welcome.  Now you stated that you've gone through

5     this criminal complaint before, correct?

6     A.  I've reviewed it, yes.

7     Q.  All right.  And nowhere within this criminal complaint is

8     Micaiah Collins' name mentioned, correct?

9     A.  I don't believe so, no.

10    Q.  You need a minute to review it to make sure?

11    A.  I don't see it in here, no.

12    Q.  Okay.  Now, within this criminal complaint, though, there

13    are a lot of things that were recovered as a result of the

14    search -- of the search warrant of the Hamad residence,

15    correct?

16    A.  Correct.

17    Q.  Okay.

18             MS. OLAIYA:  Your Honor, I am going to ask for this

19    exhibit to be admitted or take judicial notice.  It has been

20    filed already at document ECF 6.  This is why it was sealed,

21    Your Honor, 24-mj-1794.

22             THE COURT:  Why don't we just mark it as an exhibit.

23    That's probably the easiest thing to do.  Where were you up to

24    in your exhibits, M, correct?

25             MS. OLAIYA:  Yes, Your Honor.

EXHIBIT A                    73

1            MS. VASQUEZ SCHMITT:  Do you have a copy of that?  I

2    don't have it with me.  Thank you.

3            THE COURT:  We're going to mark that as Exhibit O.

4            MS. OLAIYA:  Yes, Your Honor.

5            THE COURT:  And I assume there's no objection to its

6    admission?

7            MS. VASQUEZ SCHMITT:  No, Your Honor.

8            THE COURT:  Then it's admitted.

9            MS. OLAIYA:  Thank you.

10   BY MS. OLAIYA:

11   Q.  All right.  Now, on page -- or excuse me, paragraph 34(e)

12   of the criminal complaint.  Now that shows the pictures of the

13   purported explosives that are also mentioned in the

14   superseding indictment, correct?

15   A.  Correct.

16   Q.  They're the same screenshots?

17   A.  Correct.

18   Q.  Okay.  And within that criminal complaint, there is also

19   mention of Mr. Hamad allegedly purchasing the black aluminum

20   powder and other materials that are supposedly to make an

21   incendiary device, correct?

22   A.  Correct.

23   Q.  All right.  Now turning to the grand jury process.  Are

24   you familiar with those, have you participated in those before

25   in your line of work?

EXHIBIT A                      74

1    A.   I have.

2    Q.   So you're aware then, typically, those are kept completely

3    secret from the defense, right?

4    A.   Correct.

5    Q.   Typically defense lawyers, and those who are accused,

6    they don't have any information until the person is indicted?

7    A.   Correct.

8    Q.   So that includes potential witnesses as well?

9    A.   Correct.

10   Q.   So they wouldn't know who anybody was who was going to

11   testify to a grand jury?

12   A.   Correct.

13   Q.   Now, your surveillance of Mr. Hamad, did that end once he

14   was arrested on October of last year?

15   A.   I believe so, yes.

16   Q.   But you're not sure?

17   A.   I believe, to my knowledge, yes, that's when it ended.

18   Q.   Okay.  So everything that you observed was prior to the

19   criminal complaint being filed and him being indicted?

20   A.   Correct.

21   Q.   Okay.  And turning briefly to the police report in regards

22   to the 2023 case, did you have any direct involvement with

23   that case?

24   A.   I do not.

25   Q.   So everything is second, third, fourth-hand information as

1    to that?

2    A.  On the report, correct.

3    Q.  Okay.  And those charges were dismissed, right?

4    A.  All I have is the initial police report.  But --

5    Q.  Did you have an opportunity to review the bond report in

6    this case, either from October or from this month?

7    A.  I have not, no.

8    Q.  Okay.  Did you do a criminal background check on Mr. Hamad

9    in relation to this case or someone in your office?

10   A.  Someone in the office certainly did.

11   Q.  And it said he didn't have any convictions?

12   A.  Yes.

13   Q.  Okay.  Now everything within that report, that wasn't

14   observed firsthand from law enforcement, correct?

15   A.  Correct.

16   Q.  And do you have any prior experience as to local law

17   enforcement like the Pittsburgh police, for example?

18   A.  That's not my background.  But I've interacted, certainly,

19   with local law enforcement.

20   Q.  Okay.  Did they ever inform you of the nature of any

21   family disputes and how those are typically blown out of

22   proportion?

23   A.  I have no idea.  I don't know.

24   Q.  All right.  Now during the most recent arrest of Mr. Hamad

25   last week, were you present for that arrest?

EXHIBIT A                    76

1    A.  I was not, no.

2    Q.  You aren't able to speak to anything about this arrest?

3    A.  Correct.

4    Q.  Okay.  But you are aware that the arrest was effectuated

5    without any harm or injury to anyone?

6    A.  Correct.

7    Q.  Now, for a minute I do want to turn back to the

8    superseding indictment.  You still have that in front of you?

9    A.  I do.

10   Q.  Okay.  Okay.  Paragraph 46.  I'm sorry, 49(a).  There is a

11   reference where it says, concrete gonna blow, correct?

12   A.  There is.

13   Q.  From that it's taken to mean that any potential devices

14   were going to be used to harm concrete, not a person, correct,

15   or property, rather?

16   A.  That by itself refers to concrete, yes.  I would just --

17   the words -- the sentence before it.

18   Q.  Okay.  Now, with -- going up to paragraph 46, bro's ankles

19   gone, was that ever determined by the FBI what that meant?

20   A.  It was not.

21   Q.  You don't know if that's in reference to a person or

22   statue?

23   A.  Correct.

24   Q.  Okay.  Now turning to paragraph 32.  The government

25   asserted that Mr. Hamad had threatened someone, but nowhere in

1    this sentence or quote does it state that Mr. Hamad is

2    directly going to harm a person, correct?

3    A.  Correct.

4    Q.  And turning to Government's Exhibit 10, the one that you

5    wrote earlier, you're not sure who the M person is you

6    referred to, are you?

7    A.  Not specifically, correct.

8    Q.  You can't speak to whether it's Ms. Collins or someone

9    else?

10   A.  Correct.

11        MS. OLAIYA:  One minute, please, Your Honor, if I

12   may.

13        THE COURT:  Certainly.  Take your time.

14      (Counsel confer off the record.)

15   BY MS. OLAIYA:

16   Q.  All right.  Now let's turn to paragraph 44.

17   A.  Of the superseding?

18   Q.  Yes, sorry, of the superseding indictment.  Okay.  So in

19   regards to Person 5, when was this acquired by the FBI?

20   A.  Paragraph 45, correct?

21   Q.  Correct.  In regards to the -- or excuse me, 44.

22   A.  My apologies.  So if it were Instagram, it would have been

23   whenever Instagram production came back.  Does that make

24   sense?  Like when --

25   Q.  So around November?

1    A.  I -- if that's -- honestly, I do not know.  If it came

2    from Instagram production, it's when Instagram provided

3    production back from the search warrant.  If it came from a

4    device seized at the house, or anything else, I'm sorry, I

5    don't know the specific date.

6    Q.  Okay.  Okay, now paragraph 56, there was, take your time

7    if you need to read it, but there was mention of this same

8    language in the criminal complaint filed back in October,

9    correct?

10   A.  Correct.

11   Q.  Were you present for any of the court dates that occurred

12   when this case first happened last fall?

13   A.  I did not attend any of the court dates, no.

14   Q.  Okay.  But you are aware of search warrants that were

15   executed and the bond report also that was generated by the

16   probation office?

17   A.  Yes.

18   Q.  Okay.

19        MS. OLAIYA:  Your Honor, these are prior court

20   documents, but I'm still going to ask for them to be admitted.

21   These are Exhibits G, J, K, and L.  This is not a court

22   document.  This is -- Exhibit L is a receipt of what was

23   seized from the Hamad residence on August 6th.  So what's

24   turned over in discovery to the defense by the government.

25        MS. VASQUEZ SCHMITT:  You said G -- I'm sorry, say

EXHIBIT A                    79

1    the letters again please.

2              MS. OLAIYA:  Sure, G, J, K, and L.

3              MS. VASQUEZ SCHMITT:  No objection, Your Honor.

4              THE COURT:  They are admitted.  And just to confirm

5    that's G, J, K, and L.

6    BY MS. OLAIYA:

7    Q.  Okay, now you're aware that your office had also

8    conducted, or excuse me, applied for a search warrant for

9    Mr. Hamad's DNA and fingerprints, correct?

10   A.  I am.

11   Q.  And, excuse me, that search warrant was signed off

12   mid-February, February 17th, correct?

13   A.  It was.

14   Q.  Of this year?

15   A.  Correct.

16   Q.  Okay.  And that search warrant was complied with by

17   Mr. Hamad by coming to probation and giving his DNA and

18   prints, correct?

19   A.  It was.

20   Q.  There were no issues with that compliance?

21   A.  There were not.

22   Q.  And this was well after the indictment in October of last

23   year?

24   A.  Correct.

25              MS. OLAIYA:  No further questions, Your Honor.

EXHIBIT A                    80

1        THE COURT:  Okay, thank you.  Redirect?

2        MS. VASQUEZ SCHMITT:  Very briefly Your Honor, yes.

3                    REDIRECT EXAMINATION

4   BY MS. VASQUEZ SCHMITT:

5   Q.  You were asked some questions about the Instagram return

6   which appears that something was returned on November 6th,

7   2024?

8   A.  Yes.

9   Q.  That was after the defendant was arrested the first time;

10  is that right?

11  A.  That was after October, correct.

12  Q.  When the FBI receives a production from someone like, or

13  from an institution like Meta, do the FBI agents, day one,

14  have access to every single post?

15  A.  It takes a minute to put the information, the production,

16  in a readable format.

17  Q.  So in addition to that technical aspect, is there then a

18  human being have to review it?

19  A.  Of course.

20  Q.  And does that sometimes take time?

21  A.  Of course.

22  Q.  You were asked about the defendant's combat skills.  If I

23  could please have the screen.  Can you look at paragraph --

24  could you read paragraph 16 of the superseding indictment?

25  A.  On or about October 28th, 2023, Hamad messaged another

1    individual, believed to be in Lebanon, on Instagram.  Quote, I
2    want to learn combat skills, too, that's why I joined.  Also,
3    I got an expert marksman badge which means I shot really well.
4    I want to be able to protect Lebanon in case something
5    happens.  So I need to learn combat skills now.
6    Q.  So based on these messages, the defendant was getting some
7    firearms training?
8    A.  Based off his own words.
9    Q.  And the defendant, one of the reasons he wanted to join
10   was to gain combat skills to protect Lebanon?
11   A.  Yes.
12   Q.  You were asked whether Micaiah Collins' name was in the
13   criminal complaint.  Do you remember that?
14   A.  I do.
15   Q.  But are the exact messages with Micaiah Collins who was
16   referenced as Individual 1 in the complaint?
17   A.  The same messages.
18   Q.  And were those messages from the defendant's phone?
19   A.  Yes.
20   Q.  And so would the defendant know who it was referring to?
21          MS. OLAIYA:  Objection, Your Honor, speculation.
22          THE COURT:  Overruled.
23          MS. VASQUEZ SCHMITT:  You can answer.
24          THE WITNESS:  Yes.
25   BY MS. VASQUEZ SCHMITT:

83

1   Q.  And so I think you testified on direct the FBI did know

2   about this Collins' device as of the criminal complaint,

3   right?

4   A.  Correct.

5   Q.  But did the FBI know that he had also built pipe bombs?

6   A.  No.

7   Q.  You were asked, you know, grand jury is secret and that's

8   really important, right?

9   A.  Correct.

10  Q.  Is there an exception, though, that witnesses can disclose

11  the existence of a grand jury subpoena?  If you know?

12  A.  I honestly don't know.

13  Q.  Do you know, based on -- actually, I'll just make you a

14  legal expert.  Based on your understanding of this case, of

15  the facts of this case, did some of the witnesses to grand

16  jury make it public on their own that they had been subpoenaed

17  to grand jury and were resisting?

18  A.  Yes.  There were public flyers, as we discussed, protests,

19  and such.

20  Q.  You were asked if you knew whether bro's ankles was a

21  reference to a human being or a statue; I believe you were

22  asked?

23  A.  Correct.

24  Q.  Would you need metal shrapnel to hit a statue?

25  A.  No.  I mean, clearly it would cause more damage, but, no,

1    by its own.

2    Q.  You were asked about whether you knew that the M

3    referenced in the note in defendant's phone was Micaiah

4    Collins.  Do you remember those questions?

5    A.  Correct.

6    Q.  Was that around the same time, that note, however, around

7    the same time -- let me back up.  Did the defendant reference

8    Elyanna and M in the note?

9    A.  Correct.

10    Q.  Was that around the same time that there was surveillance

11    report of the defendant meeting with Elyanna and Micaiah

12    Collins at the church?

13    A.  Correct.

14            MS. VASQUEZ SCHMITT:  No further questions.

15            THE COURT:  All right.  Anything further?

16            MS. OLAIYA:  Just briefly Your Honor.

17                    RECROSS EXAMINATION

18    BY MS. OLAIYA:

19    Q.  The phone from Mr. Hamad's residence, there were several

20    devices collected, but that phone that was taken from by law

21    enforcement in August, correct?

22    A.  The August search?

23    Q.  Yes.

24    A.  Correct.  Yes.

25    Q.  Okay.  And so, of course, law enforcement still had that

EXHIBIT A                    84

1    phone; Mr. Hamad no longer had access to it?

2    A.  Correct.

3    Q.  So he wouldn't be able to go back and read certain

4    messages that he may or may not have sent, correct?

5    A.  On that device.

6    Q.  Right.

7        And there were hundreds of messages that you gathered

8    from all the devices, not thousands in this case, correct?

9    A.  I would imagine so, yes.

10   Q.  Okay.  So you wouldn't be able to testify as to whether

11   Mr. Hamad had any recollection of what those text messages may

12   contain?

13   A.  I don't.  I don't.

14   Q.  Okay.  You also don't have any information as to whether

15   anyone disclosed anything about the grand jury proceeding to

16   Mr. Hamad?

17   A.  Individuals made public postings.  But beyond that,

18   correct.

19   Q.  Mr. Hamad, via him being on surveillance -- excuse me,

20   supervised release, he didn't have access to that, correct?

21   A.  I can't speak to that.  But it's my understanding, no, he

22   would not have access -- he would not have access to his old

23   phone anyways.

24   Q.  Okay.  But you also don't know whether -- or actually, let

25   me ask this.  So he didn't come to any of the grand jury

1    proceedings or participate in any of the protests that day?

2    A.  Not to my knowledge.

3          MS. OLAIYA:  No further questions, Your Honor.

4          THE COURT:  All right.  Thank you.  Agent Battaglia,

5    you can step down.  Thank you.

6          THE WITNESS:  Thank you, ma'am.

7          THE COURT:  May I see counsel at sidebar, please?  We

8    don't need the reporter for this.

9          (Discussion had at sidebar off the record.)

10         THE COURT:  All right.  As we discussed at sidebar, I

11   have another proceeding that begins very shortly.  We're not

12   yet concluded with this proceeding in terms of oral argument

13   or my findings.  Subject to counsel's availability, which they

14   can verify, we're going to reschedule the conclusion of this

15   proceeding for Thursday, May 1st at 9:30 a.m.  If that date or

16   time becomes an issue, we will certainly -- please let me know

17   that; we can certainly reschedule it.  I would, as I

18   mentioned, like to conclude as quickly as possible.

19         MS. VASQUEZ SCHMITT:  Your Honor, that works for the

20   government.  May I excuse Special Agent Battaglia from

21   attending that proceeding?  I assume he's finished.

22         THE COURT:  Yeah.  Unless there's some objection from

23   defense counsel, I don't think we need him any further.

24         MS. VASQUEZ SCHMITT:  Thank you.  That works for the

25   government, Your Honor.

EXHIBIT A                    86

87

```
1            MS. OLAIYA:  None.

2            THE COURT:  No objection to excusing the agent?

3            MS. OLAIYA:  Correct, Your Honor.

4            THE COURT:  Okay, then he is excused from having to

5    attend our reconvened session.  And Mr. Lipson, Ms. Olaiya,

6    you can let us know if you don't know now that that time and

7    date are okay with you.  If you know now, great, if not --

8            MS. OLAIYA:  Yes, Your Honor, that date and time

9    works for the defense.

10           THE COURT:  Okay, excellent.  Then this matter is

11   continued until Thursday, May 1st, at 9:30 a.m.  Is there

12   anything else that counsel wanted to address while we're all

13   still here?

14           MS. VASQUEZ SCHMITT:  No, thank you, Your Honor,

15           MS. OLAIYA:  Nothing from defendant.

16           MS. VASQUEZ SCHMITT:  Nothing, Your Honor, thank you.

17           THE COURT:  All right, then that concludes our

18   proceeding here today.  Thank you all very much.

19       (Proceedings concluded at 3:24 p.m.)

20                    - - - - -

21             C E R T I F I C A T E

22           I, MELISSA A. MOORE, RDR, RMR, CRR, certify that
     the foregoing is a true and correct transcript from the record
23   of proceedings in the above-entitled matter.

24           /s/ Melissa A. Moore
             MELISSA A. MOORE, RDR, RMR, CRR
25           Official Court Stenographer
```

EXHIBIT A                    87

```
           IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA


   UNITED STATES OF AMERICA,

       vs.
                                    Criminal No. 24-257
   MOHAMAD HAMAD,
                  Defendant.


                         - - -


   Transcript of proceedings on May 1, 2025 United States
   District Court, Pittsburgh, Pennsylvania, before Judge
   Patricia Dodge.



   APPEARANCES:

      For the Government:    U.S. Attorney's Office
                             Nicole Vasquez Schmitt, Esquire
                             700 Grant Street
                             Suite 4000
                             Pittsburgh, Pennsylvania 15219

      For the Defendant:     Federal Public Defender
                             Andrew Lipson, Esquire
                             Yemi Olaiya, Esquire
                             1500 Liberty Center
                             1001 Liberty Avenue
                             Pittsburgh, Pennsylvania 15222

      Court Reporter:        Barbara Metz Loch, RMR, CRR
                             700 Grant Street
                             Suite 6260
                             Pittsburgh, Pennsylvania 15219




       Proceedings recorded by mechanical stenography;
   transcript produced by computer-aided transcription.
```

EXHIBIT A                                    88

1                    P-R-O-C-E-E-D-I-N-G-S

2                      (9:34 a.m.)

3          THE COURT:  When we were last here, I believe that

4     the government had concluded any evidence or testimony it

5     wished to present; is that right?

6          MS. VASQUEZ SCHMITT:  That's correct, Your Honor.

7          THE COURT:  And at this point, does the defendant

8     choose to present any evidence or testimony, other than what

9     has already been given?

10          MS. OLAIYA:  None, Your Honor.  We would move for the

11     admission of the remainder of the exhibits, primarily, Your

12     Honor, those being letters of support for Mr. Hamad, in

13     addition to prior court-related orders in regards to this case

14     and the transcripts of the preliminary hearing that happened

15     in November that we submitted yesterday, that would be Exhibit

16     P, and Exhibit N, being a figure in regards to release, so we

17     would just ask for the remainder of those exhibits to be

18     admitted.

19          THE COURT:  Is there any objection?

20          MS. VASQUEZ SCHMITT:  No, Your Honor.

21          THE COURT:  All right then.  All of those exhibits

22     are admitted, and that would be Exhibits A through P.

23          MS. OLAIYA:  That's correct.  Thank you, Your Honor.

24          THE COURT:  Then I believe at this point, we are

25     prepared to proceed with argument, and I look forward to

1  hearing from counsel.  So, Ms. Vasquez Schmitt, let's start

2  with you.

3  MS. VASQUEZ SCHMITT:  Thank you, Your Honor.  This

4  defendant, Mohamad Hamad, should be detained pretrial.  The

5  district court judge assigned to this case, Judge Wiegand,

6  already held that he was a danger to the community and a

7  flight risk when she denied the defendant's motion to remove

8  his home detention.  This was docket No. 79.  I don't know if

9  Your Honor has seen it, but I'm going to pass up a copy.

10  THE COURT:  I have, but thank you.

11  MS. VASQUEZ SCHMITT:  Your Honor, Judge Wiegand held,

12  and I have some of the language highlighted there in that

13  docket entry, that the defendant does present a risk of flight

14  and danger to the community based on the evidence she had

15  seen, which is some of the same evidence Your Honor heard on

16  Tuesday, and Your Honor had the benefit of hearing even more.

17  Judge Wiegand continued the defendant's home

18  detention, but at the time, there was no pending request for

19  detention by the government.  Judge Wiegand could not do any

20  more, but this court can, Your Honor.  This court can protect

21  the community and assure the defendant's appearance at trial

22  by detaining him.

23  Regarding flight, which the government must only

24  prove by a preponderance of the evidence, this court saw the

25  defendant has bragged about his ability to evade law

EXHIBIT A                    90

4

1    enforcement and sneak out.  He also said explicitly that he

2    wanted to travel overseas and fight.  He gave inconsistent

3    information during his background investigation about whether

4    he had a Lebanese passport.

5            The FBI, as the testimony revealed, would only be

6    able to tell if he traveled internationally on a passport, not

7    whether one existed at all in the first place.

8            The defendant also has numerous foreign contacts

9    which he also initially lied about during his background

10   investigation.  These facts establish by a preponderance of

11   the evidence that the defendant is a flight risk.

12           The Bail Reform Act also refers to the risk that the

13   defendant will obstruct justice or attempt to obstruct

14   justice.  Here, while on home detention, the defendant began

15   attending Micaiah Collins' father's church in February of 2025

16   and attended it for approximately ten weeks.

17           The defendant is not Christian.  He is Muslim.  If he

18   had been curious about Christianity, certainly he could have

19   attended a church in his own neighborhood, but instead, he

20   chose to go across town to the church where he had been seen

21   on surveillance with the now codefendant Micaiah Collins and

22   others who could be witnesses in this case.

23           The note on his phone from October 2024 suggest they

24   may have been discussing blowing the FBI surveillance and

25   dying standing while at that church.

EXHIBIT A                    91

5

1          We do not, Your Honor, as was apparent, have evidence

2     of who attended the church with the defendant in the last few

3     months.  We just found out he was going there, but it's no

4     great leap to conclude that Micaiah Collins was there.  It's

5     her father's church.  The defendant knew what he did with

6     Micaiah Collins.  He knew she was referenced in the complaint.

7     They were his messages, his conduct.  Surely he knew who he

8     detonated a device with that night.

9          Indeed, the defendant is now charged with conspiring

10    with Micaiah Collins to build bombs.  This is not someone he

11    should have been meeting with while on home detention.  The

12    time frame of his attendance at the church also lines up

13    exactly with when there were multiple posts, fliers and

14    protests regarding witnesses resisting the grand jury in this

15    case.

16         Interestingly, the defendant did not begin going to

17    the church right after his arrest.  It wasn't until February

18    when the government was subpoenaing witnesses to the grand

19    jury that he began his attendance at Micaiah Collins' father's

20    church.

21         The upshot of all this is it can allow the court to

22    conclude that the defendant may attempt to obstruct justice if

23    he is allowed to remain on bond.  He certainly did not tell

24    his probation officer whose church it was or give him all the

25    facts.  This is par for the course for the defendant who

EXHIBIT A                    92

6

1     believes he can one-up law enforcement.

2           The defense will argue that he didn't technically

3     violate a bond condition because that condition was struck.

4     Probation Officer Orrison testified that, in 14 years, he had

5     never seen that box unchecked that you can't have contact with

6     witnesses and victims.

7           Defense did mark newly the transcript from that

8     hearing and that transcript is telling.  It shows that it was

9     the added language forbidding the defendant from Jewish-owned

10    or affiliated locations.  That was the subject of the debate,

11    Your Honor.  There was no mention in that 100-plus page

12    transcript about whether he could have contact with witnesses

13    or victims.  It was that added language that was the subject

14    of the debate.

15          In any event, Your Honor, this court doesn't need to

16    find a bond violation in order to detain the defendant.  The

17    point the government is trying to make is that there is

18    evidence that this defendant, while on home detention, was

19    attempting to obstruct or was in fact obstructing justice by

20    meeting with potential witnesses.

21          Most importantly, Your Honor, regarding danger to the

22    community, this defendant has shared violent militant pro

23    Hamas, pro Hezbollah content, including from the October 7

24    Hamas attacks of multiple murdered individuals.  When he

25    shared these videos, he stated things like "Us Muslims never

EXHIBIT A                          93

1    surrender or back down" and "Lebanon just smoked they ass."

2    He shared a video of children being indoctrinated

3    with Hamas propaganda.  He threatened people online.  He

4    stated his desire for bullets to touch the foreheads of

5    Zionists.  He expressed a desire to fight and die as a martyr.

6    He called himself a terrorist and a Hamas operative.

7    He bragged about stealing flags and terrorizing

8    residents while dressed as a Hamas operative.  He spray

9    painted a Hamas target on to a Jewish institution.  He

10    manufactured and tested explosives, including pipe bombs and

11    explosives with shrapnel.

12    Your Honor, we don't know definitively what his plans

13    were for the explosives, but the messages with Collins and

14    Lubit are extremely concerning.  He and Lubit talked about an

15    upcoming exercise on the defendant's military base, but then

16    said don't talk about this over text, and he and Collins

17    discussed blowing up people's ankles in concrete.

18    The FBI unfortunately did not recover the explosive

19    materials in this case.  They could be hidden in his home or

20    elsewhere, which is a very dangerous situation.

21    Also, the defendant was screen shotting recipes for

22    explosives on October 30, 2024, the day of his arrest, and

23    there was a note on his phone stating that he wanted to die

24    standing rather than face serious federal charges.

25    Your Honor, the government also has concerns about

EXHIBIT A                              94

8

1    the defendant being on an extended period of home detention

2    with his family.  As the court heard, there have been

3    allegations of the defendant's violent, aggressive and

4    threatening behavior to his family members.  We all know there

5    are many reasons why domestic disputes do not always lead to a

6    conviction.

7            The police report states the defendant admitted to

8    the altercation with his sister.  The defendant threatened to

9    shoot his sister, who was 13 at the time, in the face with a

10   metal pellet that travels as fast as a bullet.

11           The report also states he pushed his mother, held a

12   knife to his brother's throat in the past and was generally

13   physically aggressive to his parents, but they didn't report

14   him.  His brother and sister said they were scared for their

15   safety and the safety of their family members based on the

16   defendant's conduct.  His sister is still a minor, and she

17   still resides at the residence.

18           And now he is home, not working, not attending

19   school.  If his behavior was escalating before, imagine the

20   tension and anger the defendant will be feeling now if he's

21   sent home.  Federal cases can be long.  An extended period of

22   home detention here can put his family members at risk, and

23   certainly, the government would oppose ever removing that

24   condition.

25           Your Honor, this is a unique situation, where a

EXHIBIT A                    95

1    defendant was initially charged with some misdemeanors and now

2    where the full nature of his conduct and dangerousness has

3    later been uncovered by the government.  It is a unique

4    situation before the court.  The court must assess the risk of

5    flight and dangerousness based on the full record before it

6    today.

7            Importantly, Your Honor, pretrial services is now

8    recommending detention.  They, out of everyone in this room,

9    know best about how the defendant behaved on bond, and yet

10   they are still recommending that he be detained today.

11           The stakes are so much higher for the defendant, now

12   that he's charged with multiple felonies.

13           He may have thought he got away with a lot of his

14   conduct and was just waiting out the misdemeanor charges, Your

15   Honor, but now he has much more incentive to flee.  Much more

16   incentive to put his plans into action to harm the community.

17           For all of those reasons, Your Honor, the court

18   should detain the defendant pretrial.  Thank you.

19           THE COURT:  Thank you very much.  I'll hear now from

20   Ms. Olaiya, please.

21           MS. OLAIYA:  Thank you, Your Honor.  Your Honor, this

22   case boils down to what the law says and what the facts are.

23           First, turning to some of the points that the

24   government made during its argument.  Number one, while Judge

25   Wiegand decided to keep Mr. Hamad on home detention, the

1    assertion that she could not have done more is simply false.
2    She could have, based on the government's assertion, requested
3    a detention hearing and had Mr. Hamad detained if she felt
4    that he was indeed a danger and that there were no conditions
5    that could be placed on him.

6            Instead, what she did was decide to keep him on home
7    detention, clearly signaling that there are conditions that
8    can be put in place and she decided to have those conditions
9    remain in place, which clearly show that there is a reasonable
10   assurance for both his appearance as well as the safety of the
11   community.

12           Secondly, Your Honor, attacking religion is wholly
13   unconstitutional on the government's part.  Where Mr. Hamad
14   decides to practice his faith, who he decides to commune with
15   under the First Amendment is protected.  There is absolutely
16   no evidence that Micaiah Collins or any other witnesses or
17   potential witnesses in this case were ever present at that
18   church.

19           Probation, Ben Orrison, did know about Mr. Hamad's
20   whereabouts.  Every single time he went to that church, he
21   called Mr. Orrison to make sure that he was aware, to make
22   sure that he had permission, and if there was any concern at
23   all, at any point in time, probation could have raised it with
24   the court, which they did not, clearly showing that there was
25   no violation and that he did not meet with witnesses.

1        What further evidences this, Your Honor, is that if

2   there was indeed an obstruction, the government could have

3   indicted it, if they believe he had been meeting with

4   witnesses or tainting, in some sort of way, evidence or

5   potential witnesses, but they never did that.

6        To the contrary, Your Honor, the government then

7   turned around and decided to indict a person who they wanted

8   to use as a witness.  Not to mention, Your Honor, just to make

9   clear, the government is also asserting that Mr. Hamad was the

10  one who spray painted a building, but their own theory of

11  their case is that it was not Mr. Hamad.  So to say that now

12  is very disingenuous during this very contentious detention

13  hearing.

14       Every alleged offense, Your Honor, took place before

15  Mr. Hamad was ever indicted.  The government asserts that, had

16  it known this information at the time of the indictment, it

17  would not have agreed to release, yet the government's own

18  witness on cross-examination could not provide a definitive

19  answer as to when these alleged aggravating factors were

20  finally discovered.

21       So we are left with what the government had and when

22  they had it.  The first search of Mr. Hamad's home took place

23  in August of last year, August 2024.  This is when the

24  government seized the phone that had the most concerning

25  information presented in this case, including alleged

1    incendiary devices and Mr. Hamad allegedly detonated them.

2         Then in November, as shown by Exhibit M, the

3    government had information from Mr. Hamad's Instagram account

4    as presented to the defense during discovery.

5         The fact remains that the government cannot say it

6    just learned about this alleged information a week ago, two

7    weeks ago or even 30 days ago.  To the contrary, in November

8    of 2024, in Exhibit B, this is on page 37 of the transcript,

9    Your Honor, from the preliminary hearing, lines 12 through

10   613, AUSA Carolyn Bloch asked Agent Brian Collins:

11        On July 7, Mr. Hamad and that individual continued to

12   have conversations.  Did the other individual send Mr. Hamad a

13   video of them undertaking the explosion of this test run?

14        Yes, the text is I keep watching the video, and then

15   individual number one sent Mr. Hamad a video clip.

16        This clearly shows, Your Honor, that the government

17   had this information and was aware of it, of the most serious

18   offenses that they are alleging today.

19        This is part of the very foundation of the

20   government's argument about why they are now seeking

21   detention.  This then means that what is true is that the

22   government had this information in their possession for almost

23   half a year while Mr. Hamad was on pretrial release.

24        Here are more facts.  We are in a unique situation

25   because, as the government mentioned, rarely does the court or

1   any of us have an opportunity to test whether there are indeed

2   any conditions of release that can be put in place that would

3   reasonably assure the person's appearance and the safety of

4   the community.  Yet we are in that exact situation today.

5        Mr. Hamad has been fully successful on pretrial

6   release.  There have been no violations of pretrial release,

7   as testified to by Ben Orrison who was directly supervising

8   Mr. Hamad.  There is no harm he has caused to anyone while on

9   release.  There have been two court ordered appearances since

10  Mr. Hamad's arrest while he was on release which he fully

11  complied with, Exhibit G being the warrant this honorable

12  court signed for Mr. Hamad's prints and DNA in February.

13       What some would feel is a complete violation of their

14  person, their bodily autonomy and in response to that, might

15  defy a court order, Mr. Hamad did what this court ordered him

16  to do.  He came to this very courthouse and fully complied in

17  giving both his DNA and fingerprints to the government.

18  Mr. Hamad has consistently done what has been required of him.

19       And while the law only requires reasonable assurance

20  and not a guarantee regarding conditions of release,

21  Mr. Hamad's behavior on pretrial release unequivocally shows

22  that conditions do exist that assure both his appearance and

23  community safety.

24       Now, Exhibit G, the original bond report in this

25  case, states that Mr. Hamad can be released on conditions.  It

EXHIBIT A                    100

14

1    also included the offense from 2022 that the government is

2    trying to use against Mr. Hamad and besmirch his character.

3    The simple truth is the charges were dismissed and cannot be

4    held against Mr. Hamad for that very reason.

5        His family is here willing and ready and happily and

6    painstakingly supporting him and wanting to see his release.

7    Ben Orrison, probation officer who is directly supervising

8    Mr. Hamad, went to his house several times, spoke with his

9    parents, met his little sister.  At any point in time if they

10   had any concern about Mr. Hamad being there, they could have

11   expressed it, and they did not.

12       To the contrary, they wanted him back home, and they

13   are here today showing their presence, stating that they want

14   him home again.

15       Now, turning to Mr. Hamad himself, his character, his

16   physical and mental condition.  After this case, Mr. Hamad

17   unfortunately developed issues with his health.  These issues

18   are ongoing and they are unknown at this time because further

19   testing is necessary.  Right before his arrest, Mr. Hamad did

20   have an appointment for the following day which obviously he

21   wasn't able to attend, but he's hoping, with these

22   appointments, to get an official diagnosis for the care he

23   will need.

24       As we know, the jail is probably unlikely to be

25   equipped to determine a diagnosis for Mr. Hamad, let alone

EXHIBIT A                    101

1    care for it over a period of time.

2         The family ties that Mr. Hamad has, again, are very

3    strong.  They're here.  They want to help him through this

4    incredibly difficult time and see him through this process

5    successfully.  Mr. Hamad lacks financial resources due to his

6    inability to work right now because of a lack of

7    transportation.

8         Where he's currently living is not like he can hop on

9    a bus or catch a ride or anything of that nature.  He does not

10   have a license right now, and so he is, for all intents and

11   purposes, confined primarily just to his home.

12        Additionally, Your Honor, he also does not have his

13   U.S. passport.  The only passport that has indeed been issued

14   to him has been turned over to the United States Probation, so

15   the risk of flight is completely mitigated, Your Honor, in

16   this case.

17        Mr. Hamad, he has lived and was raised in the greater

18   Pittsburgh community.  He has very strong community ties, as

19   evidenced by the moving letters of support.  He has the full

20   courtroom here backing him, Your Honor, for every court date

21   he had.  He has people here who love him, who care about him,

22   of all faiths, Muslim, Jewish, Christian, atheist, who all

23   want to see him succeed on pretrial release and put forth to

24   the court that, whatever they can do to augment that, they

25   will.

16

1          All that has changed, Your Honor, is that the

2    government has finally decided to put forth information that

3    it has been sitting on and has had in its possession since the

4    beginning of last November, at the very latest.

5          What has happened since then?  All of November

6    passed, and there's no new detention request.  All of December

7    passed.  No request for detention.  All of January passed.  No

8    request for detention.

9          February comes along.  Still no request for

10   detention, but again, Mr. Hamad comes to court, gives his DNA

11   and prints, complying with the court order, and frankly if

12   Mr. Hamad was the person that the government is trying to

13   paint him out to be, he could have fled then.  If he had the

14   capability to cause harm, he would have done so then, but he

15   didn't because that is not his character, that is not who he

16   is, and that is not who the government is trying to make him

17   out to be.

18          All of March passes, Your Honor.  Again, still no

19   request for detention.

20          As it relates to the current bond report, Your Honor,

21   Ben Orrison did not write that bond report.  He didn't

22   participate in any of the interviews.  To the contrary, Your

23   Honor, all bond reports go through, as this court knows, the

24   supervisory channel before it is presented to the court, and

25   as discussed in the report, all of their assessments are based

EXHIBIT A                    103

1    off of what the government is alleging.  Not who Mr. Hamad is

2    as a person.  Not because he has failed during pretrial

3    release.

4          He has been completely successful, as testified to by

5    the government's own witness.  Unfortunately, probation simply

6    does not take that into account and only goes off of the

7    offenses that the government is alleging.

8          Finally, Your Honor, what we have here at the end of

9    April, and that the government is now seeking detention, but

10   the strongest and immutable fact is that Mohamad has been on

11   pretrial release for half a year and has been fully compliant

12   with his conditions of release and none of this alleged

13   information occurred while -- before he was indicted.

14         He has family and friends from this community who

15   love him dearly and want to see him through this process and

16   continue to help him be successful on pretrial release.  To

17   detain him now would be nothing short of punitive and in utter

18   misalignment with the law.  Thank you.

19         THE COURT:  Let me ask you a couple of questions.

20   With respect to the issue of transportation, I've heard what

21   you've said.  Do you know how he has been transported back and

22   forth when he has attended religious services?

23         MS. OLAIYA:  It's been primarily his father, Your

24   Honor, who also transports him to court.

25         THE COURT:  You mentioned health issues.  I don't

18

1    want to pry into anything that's confidential or not yet

2    diagnosed, but I didn't hear any evidence about health issues.

3         Do you want to speak further of that?  And if it's

4    private, I understand.

5         MS. OLAIYA:  I can attest to Your Honor that Ben

6    Orrison did mention on the stand that Mr. Hamad has talked to

7    him about his ongoing health issues.  If the court would like

8    more details, we can happily approach sidebar.

9         THE COURT:  That's all right.  I don't.

10        With respect to the issue of the passport, and again,

11   to the extent that you can discuss this with me, there's been

12   conflicting evidence about whether Mr. Hamad has another

13   passport.  Do you have any information that you feel you can

14   share with me on that subject?

15        MS. OLAIYA:  Just that absolutely he does not.  He

16   does not.  I can't, unfortunately, present the negative, but

17   he does not have a Lebanese passport.  Only a U.S. passport.

18        MR. LIPSON:  One moment, Your Honor.

19        MS. VASQUEZ SCHMITT:  Your Honor, I would object to

20   her -- if she is going to offer a proffer on a fact, I would

21   ask that her client be offered for cross-examination or some

22   other witness be offered for cross-examination on that

23   proffer.

24        THE COURT:  Again, we are beyond the hearing point.

25   My question was only you indicated that he did not have it,

1    and I've not heard any evidence one way or the other.  I think

2    the evidence was that he had stated that he had one and then

3    later said that he didn't.  Is that your understanding of the

4    testimony here?

5         MS. OLAIYA:  Yes.  He conferred with his father,

6    based on the testimony, who handles the passports and was able

7    to confirm he did not have one.  Based on cross-examination,

8    asking the FBI agent whether or not he could determine if

9    there were any foreign documents, I believe he stated, that a

10   person uses to travel, he confirmed that he did look into that

11   and that there was nothing in regards to Mr. Hamad had ever

12   done traveling with foreign documents aside from a U.S.

13   passport.

14        THE COURT:  Thank you.

15        Further argument, Ms. Vasquez Schmitt?

16        MS. VASQUEZ SCHMITT:  Your Honor, just to the point

17   about Micaiah Collins, just briefly.  Probation Officer

18   Orrison testified he didn't know about the connection to the

19   church.  That's why he was approving those visits, and he

20   testified that if he -- if there was a possibility of the

21   defendant meeting with potential witnesses, he would have had

22   to dig into that much more, talk to the government, et cetera,

23   and that didn't happen in this case.

24        I want to thank Attorney Olaiya for pointing out I

25   should have said he conspired to spray paint a target for

1    destruction on a Jewish religious real property and surveilled

2    that institution wearing Hamas gear.

3         With respect to the timing of the government's

4    knowledge, Your Honor, it's really no surprise they're

5    focusing on this because the evidence is so strong related to

6    danger of the community and flight risk.  They want to dig

7    into exactly what date the government knew what.

8         I think the testimony was Instagram came in in

9    November, but then Special Agent Battaglia explained there

10   were some technical difficulties and then a human being has to

11   lay eyes on things.  When there are terabytes of data, some

12   things can get missed.

13        I want to be clear that it's not that we knew

14   everything that was presented to the court in November, and

15   that's not what the evidence showed.

16        Your Honor, there's nothing improper about seeking

17   detention now that he is facing multiple felonies and now that

18   we have this new information.

19        Respectfully, the timing of when we knew it honestly

20   doesn't matter.  The court needs to assess the facts sitting

21   here today.

22        With respect to -- Your Honor already discussed,

23   there's no evidence in the record about health issues.  You

24   know, suddenly he needs to schedule appointments.  He's had

25   all these months to schedule appointments, and suddenly he

EXHIBIT A                    107

1    needs to do that now.

2            Honestly, probation considers much more than

3    allegations in the indictment.  Actually, usually in bond

4    reports, they say we don't consider the nature and

5    circumstances of the offense and the weight of the evidence.

6    In fact, they consider all of the defendant's characteristics,

7    and that's in fact what they focus on, not necessarily just

8    the government's allegations, and they are recommending

9    detention today, their office, even though Mr. Orrison wasn't

10   directly involved in that recommendation.

11           Thank you, Your Honor.

12           THE COURT:  Ms. Olaiya, anything further?

13           MS. OLAIYA:  One moment, Your Honor.  I'm sorry.  If

14   I could.

15      (Brief pause.)

16           MS. OLAIYA:  Just putting a stipulation, Your Honor,

17   that I failed to put in at the beginning of this hearing.  My

18   apologies.  There were several paragraphs that, yesterday,

19   both the government and the defense agreed came from the phone

20   that was seized from Mr. Hamad's residence on -- in August of

21   2024 and just noting it for the record.  It's paragraph 47.

22           THE COURT:  Of what document?

23           MS. OLAIYA:  I'm sorry, Your Honor.  The superseding

24   indictment.

25           THE COURT:  Thank you.

1          MS. OLAIYA:  47, Your Honor, being the stipulation

2     that it came from Instagram, and then paragraph 60, paragraph

3     65 and paragraph 67, those ones coming from the phone, Your

4     Honor.

5          MS. VASQUEZ SCHMITT:  Your Honor, we don't have a

6     problem stipulating to that.  We discussed with counsel if

7     they would also stipulate that we didn't know about any of

8     those paragraphs at the time of his initial arrest on October

9     30, 2024.

10          THE COURT:  All right.  Anything further, counsel?

11          MS. OLAIYA:  Just confirming, Your Honor, that it's

12     60, 65, 67 and 70 from the phone and as the government pointed

13     out 47 from the Instagram.

14          THE COURT:  Thank you.  At this point, I'm going to

15     turn to my findings and conclusions in connection with the

16     government's request for detention.  As indicated throughout

17     this process, the government has requested detention and

18     requested to detain Mr. Hamad pending the trial in this matter

19     on several bases.

20          First, that he represents a danger to others in the

21     community and that he is a flight risk.  Also it was argued

22     today and in the request for detention that there is a risk

23     that Mr. Hamad will obstruct or attempt to obstruct justice,

24     and certainly that's why we are here today.

25          I will also note that we are here on a superseding

EXHIBIT A                    109

23

1    indictment that was issued by the grand jury in April of this

2    year.  That includes nine counts, some of which were alleged

3    in the previous indictment, some of which were not, so we are

4    addressing those nine counts here today.

5           As the parties know, I'm required to consider the

6    four specific factors in the Bail Reform Act in order to make

7    a determination about detention, and I'm going to go through

8    those now.

9           And I will review some of the testimony and evidence,

10   not all of it, but I have considered all of it, including all

11   of the exhibits introduced by both the government and

12   Mr. Hamad as well as the testimony of Officer Orrison and FBI

13   Agent Battaglia.

14          The first of those factors that I must consider is

15   the nature and circumstances of the alleged offenses.  And in

16   summary fashion, I'm going to review some of the evidence with

17   respect to the nature and circumstances.  We know, for

18   example, that at some point in time, Mr. Hamad determined that

19   he wanted to become a member of the Pennsylvania Air National

20   Guard.

21          According to the indictment, he presented false

22   information to the government during interviews regarding his

23   ultimate allegiance to the United States.  There is a fair

24   amount of evidence that suggests that, in statements

25   otherwise, he indicated that the country of Lebanon and

EXHIBIT A                    110

24

1  Palestine were number one in his consideration, that he joined

2  the Air National Guard in order to learn combat skills.

3       At one point, referred to himself as a Hamas

4  terrorist.  Shared pro Hamas videos, content and propaganda,

5  and at one point stated, "Let America kiss my ass."

6       Therefore, I view those to be serious allegations

7  regarding dishonesty to the government about his allegiance to

8  the United States.

9       We also know that, with respect to the nature and

10  circumstances, Mr. Hamad allegedly was part of a conspiracy to

11  deface Jewish religious property, and in one such instance, a

12  spray paint of -- an inverted triangle was spray painted at

13  the Chabad.  That, at least according to the testimony I

14  heard, represents that location would be a target.

15       We also know, based upon the allegations in

16  the indictment, that at various points, Mr. Hamad manufactured

17  and detonated explosives.  The current location of anything he

18  may have ordered under a pseudonym are not known at this time.

19       We also know that he at least stated that he was

20  stealing Israeli flags and that he understood that might

21  create terror if individuals at the homes where that was

22  located would create terror if they saw how he was dressed.

23       He has also referred to himself as a Hamas operative

24  and indicated that Jews are the enemy.

25       So I certainly view the circumstances and the nature

EXHIBIT A                    111

1    of the offenses with which Mr. Hamad has been charged,

2    understanding he's entitled to the presumption of innocence,

3    are serious.

4         In terms of the weight of the evidence, certainly we

5    know that a federal grand jury has returned an indictment

6    which reflects that the grand jury viewed that there was

7    probable cause to indict Mr. Hamad on the nine counts with

8    which he has been charged, and I view otherwise the weight

9    here to be strong based upon the testimony of FBI Agent

10   Battaglia regarding the investigation that was conducted in

11   connection with the charges against him, and I'll get back to

12   some of the timing of that at a later point.

13        With respect to the history and characteristics,

14   which is the third factor I'm required to consider, I'm basing

15   that, in part, on testimony provided during the hearing, in

16   part, on the pretrial services report and other evidence that

17   was submitted, and let me summarize what some of that evidence

18   revealed.

19        Mr. Hamad does have ties to this area.  He was born

20   in Ohio.  He resides with his parents and his minor sister in

21   Coraopolis, Pennsylvania.  He is unemployed, single and does

22   not -- it does not appear that he has had any employment other

23   than his time with the Air National Guard, which apparently

24   has been suspended based upon the investigation in terms of

25   some of his actions and statements.

1      He is a dual citizen of the United States and

2  Lebanon.  He may or may not have a Lebanese passport.  I'm not

3  basing any of my findings specifically on that, because I

4  don't think we have any evidence to the effect that he does

5  have one.  He does have ties both here to the United States

6  and to Lebanon.

7      In terms of other history and characteristics, he

8  indicated at one point that he wanted to join the Air National

9  Guard in order to learn combat skills.  He has described

10  himself as a Hamas operative and a terrorist.  He has stated

11  at various times that he does not want to live here, that he

12  wants to die fighting, that he doesn't see himself living

13  long.  His ultimate goal is shahid, in other words martyrdom,

14  and he wants to go to Palestine.

15      He's also testified that he endorses at least the

16  statement that bullets should touch the foreheads of Zionists.

17      He has, at various points, bragged about his

18  ability -- I'm sorry, at one point bragged about his ability

19  to evade law enforcement and suggested he would delete his

20  chats in order to keep that information from the Air National

21  Guard.

22      He has manufactured and tested explosives, and while

23  professing that he wants to engage in the fight overseas, he

24  has not confined his actions to going to Palestine.  He has in

25  fact been charged at least with defacing Jewish religious

1    property, stole Israeli flags and, as I mentioned previously,

2    manufactured explosives and detonated explosives in this

3    country for a purpose, at least at this point, unknown.

4        I certainly acknowledge and agree that he has

5    complied with the conditions of his pretrial release.  There's

6    no evidence otherwise.  He has attended the Valley View

7    Presbyterian Church since February at least ten times.

8    Certainly it is well within his prerogative to do so, as he

9    has the right to exercise his religion.

10        I will note, however, that despite not being able to

11    get transportation to seek any employment, he has been able to

12    be transported all ten times, apparently, to that church, and

13    I will note that the father of one of his codefendants is the

14    pastor at that church.

15        Again, that does not mean that he cannot attend that

16    church, but I do find the timing of beginning to attend that

17    in conjunction with the request to modify his conditions of

18    release to be interesting.

19        He does not have an extensive criminal history.  I

20    have reviewed the police report that was submitted as Exhibit

21    1 by the government.  Obviously, there were no charges

22    assessed there.  There is some concern in my mind about

23    threats of violence, but there has been, as indicated, no

24    conviction with respect to that.

25        I am also concerned about the testimony of FBI agent

EXHIBIT A                    114

28

1    Battaglia about Mr. Hamad's conduct when he was arrested on

2    the most recent indictment.  In other words, refusing to come

3    downstairs for some point and engaging in language that would

4    not be appropriate, in my view, under the circumstances.

5        So I have considered all of that.  I've also

6    considered what the -- what Mr. Hamad has submitted as

7    character references, and I have reviewed all of those, and

8    certainly, there is no question that he has the support of

9    friends and colleagues who remain willing to assist him, and

10    certainly I appreciate their communications to me about that

11    and have taken that into consideration.

12        I've also considered the entire pretrial services

13    report, including its recommendation that Mr. Hamad should be

14    detained.  I've also reviewed, prior to today, both the motion

15    to amend his conditions of pretrial release as well as the

16    government's response to that, as well as Judge Wiegand's

17    conclusion that Mr. Hamad does represent a danger to the

18    community and a flight risk.

19        I do feel that the stakes are higher now, as

20    Ms. Vasquez Schmitt indicated, than they were when Mr. Hamad

21    was placed on conditions of release previously, given the

22    nature of the offenses with which he has now been charged.  I

23    do note that many of the facts that I've heard here today were

24    presented in a prior proceeding and are not new.

25        I did hear, based upon the testimony of Agent

EXHIBIT A                    115

1   Battaglia, that there were a number of things that the FBI did

2   not know when Mr. Hamad was arrested in October of 2024.  That

3   includes the Instagram videos, some of which we've seen here

4   today that reflect violent conduct, the explosion of pipe

5   bombs in State College or near State College, the fact that

6   Mr. Hamad was looking for instructions about how to build

7   explosive devices, contents of the police report from Moon

8   Township that Mr. Hamad wanted to travel to Palestine and the

9   possibility, and I'm saying just the possibility, of a

10  Lebanese passport, again not saying there was one, I don't

11  think there's any evidence to that effect, but Agent Battaglia

12  also testified about knowledge of Lebanese friends and family

13  which would not be unusual, given Mr. Hamad's dual

14  citizenship.

15       I have also considered the nature and seriousness of

16  danger to others in the community.  I certainly don't doubt

17  that Mr. Hamad, as far as all of us know, has complied with

18  the conditions of his pretrial release.  Nonetheless, I am

19  also concerned about some of the addition evidence I've heard,

20  plus the existence of a number of other charges in the

21  indictment.

22       Walking through the risk of flight, I note that, as I

23  mentioned earlier, there appears to me to be more incentive

24  now to flee based upon additional charges, and Mr. Hamad, at

25  one point at least, has bragged about his ability to evade law

30

1    enforcement, and certainly we know that, with that heightened

2    incentive, there may be a further incentive to avoid the

3    charges here.

4         With respect to the government's allegation to

5    obstruct justice, all I'll note about that is that I do find

6    it interesting that, while Mr. Hamad may certainly observe any

7    religion freely that he chooses to do or no religion at all,

8    the fact that he has, since February, been attending a church

9    at which his codefendant's father is the pastor, I find to be

10   somewhat interesting, and of course, we know that Defendant

11   Collins was part of what is alleged to be a conspiracy to

12   build explosive devices, and in fact, certain of those were

13   detonated, whether that was with Ms. Collins or not.

14        And I also note that there has been some evidence

15   presented about what has occurred just before Mr. Hamad's

16   indictment with respect to grand jury resistance and

17   subpoenas.

18        I've also examined the danger to the community.  I

19   observed Judge Wiegand's statements.  I've reviewed all of the

20   evidence here today, and despite the fact that Mr. Hamad has

21   reflected, as far as I know, compliance with the conditions of

22   pretrial release, I do find, by clear and convincing evidence,

23   that there are no conditions or combination of conditions that

24   will reasonably assure the safety of others based upon

25   Mr. Hamad's actions, Mr. Hamad's statements, Mr. Hamad's

1    professed allegiance to Hamas, terroristic activities and

2    engaging in conduct that seems to suggest that that will

3    continue if he is released on conditions.

4         I'll note that being on home detention simply means

5    that.  In the event someone does not comply with those terms,

6    eventually that will be known, but there is no instant

7    notification that someone is evading the terms of their home

8    detention.

9         So based upon all of those matters, the finding of

10   Judge Wiegand and the testimony here about Mr. Hamad's

11   professed allegiances and conduct, I am finding, by clear and

12   convincing evidence, that there are no conditions that will

13   reasonably assure the others based upon the new charges.

14        With respect to risk of flight, I'm not finding there

15   is a significant risk of flight here, simply because I don't

16   have enough evidence to suggest that Mr. Hamad has the

17   resources or the ability to flee, even though I will note that

18   there is likely to be a heightened urgency about his current

19   status based upon the addition of new charges.

20        I will issue an order to that effect after this

21   proceeding here today.

22        Ms. Vasquez Schmitt, is there anything further that

23   you wanted to address?

24        MS. VASQUEZ SCHMITT:  No.  Thank you, Your Honor.

25        THE COURT:  Ms. Olaiya, Mr. Lipson, anything further?

EXHIBIT A                    118

32

1          MS. OLAIYA:  Nothing, Your Honor.

2          THE COURT:  That concludes our proceeding.  Thank

3    you.

4       (At 10:22 a.m., the proceedings were adjourned.)

5                    C E R T I F I C A T E

6          I, BARBARA METZ LOCH, RMR, CRR, certify that the
     foregoing is a correct transcript from the record of
7    proceedings in the above-entitled case.

8

9    _\s\ Barbara Metz Loch_              May 19, 2025_
     BARBARA METZ LOCH, RMR, CRR         Date of Certification
10   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A                    119